[No. 8032.]

BOLLES V. O'BRIEN.

1. EVIDENCE—*Competency*. Plaintiff, in an effort to contradict a witness for defendant, was allowed to show that in the trial of another action, involving a different issue, another witness, not shown to be dead or beyond the jurisdiction, had testified to facts disclosing a knowledge on his part of the particular matters in controversy in the pending action, and that they were otherwise than as testified by defendant's witness. *Held* error. (264-267.)

In an action by an attorney for fees, as tending to show the experience, skill and ability of the attorney, evidence was received that the client, in a transaction long since closed, and in respect of which the attorney was not demanding compensation, had, upon one investment of $4,200, realized in eighteen months a profit of $100,000. *Held* incompetent and prejudicial. (269.)

The fee received by the attorney in such past transaction was also inadmissible. (270.)

The attorney and the client had entered into a contract, in the nature of a partnership, touching certain investments in lands in Florida. The contract had been annulled by the judgment of the Supreme Court of that state, and the attorney was sueing upon a *quantum meruit* for the value of his services to the client in the matter of the Florida investments. *Held* that conversations of defendant relating to the contract so annulled and the conduct of the parties thereunder were inadmissible. (272.)

Conversations between the attorney and the client as to the compensation of the latter, which conversation led up to the contract between them, afterwards annulled by the court of Florida, he'd admissible, as an admission of the client as to the value of the attorney's services. The subsequent reduction to writing, and that the court of Florida had declared it invalid, not being sufficient to exclude it. (272-276.)

The attorney demanding compensation for his services to the client in the purchase and sale of lands in Florida, it was held competent for the plaintiff to show the value of the client's holdings in Florida, purchased and partly disposed of during the attorney's employment. The magnitude of the enterprise, and the results obtained, being factors in determining the measure of the attorney's compensation. (277, 278.)

So the amount received by the client from a corporation which he had organized for dealing in the Florida lands. (278.)

2. ATTORNEY AND CLIENT—*Non-Professional Services Rendered by the Attorney, c. g.*, in a business capacity, and incident to the matters and causes in which he acts professionally, may be allowed for and recovered by the attorney in the same action in which he demands compensation for his professional services. (277.)

*Error to El Paso District Court.* HON. J. W. SHEAFOR, Judge.

Mr. JAMES A. ORR, Messrs. VAILE, MCALLISTER & VAILE, for plaintiff in error.

Mr. JOHN R. SMITH, Mr. CHARLES S. THOMAS, Mr. HENRY C. HALL, Mr. SAMUEL H. KINSLEY, for defendant in error.

HILL, J., delivered the opinion of the court.

The defendant in error (hereafter designated as the plaintiff) who is an attorney and counselor at law, brought this suit against the plaintiff in error (hereafter called the defendant) to recover for services rendered the defendant between August 1st, 1908, and March 20th, 1910, and for certain disbursements. The verdict and judgment were for the plaintiff. The defendant brings the case here for review. Numerous assignments of error are urged. We will only comment upon such as we think are entitled to serious consideration, and which will require attention upon a new trial.

It appears from the record, that the plaintiff had for several years been attorney for the defendant in various enterprises in which the latter had been interested; that in July, 1908, the defendant purchased a considerable tract of land in Florida, which was followed by other and larger purchases in the latter part of that year; that O'Brien, among other things, acted as his attorney in the most, if not all, of these transactions (a question which is in dispute) ; that on January 19th, 1909, they had a conversation concerning the compensation O'Brien was to receive for his services in these Florida land matters; that this question had not been settled prior thereto; that immediately after this conversation an agreement in writing was signed by the parties; that this agreement was, by its terms, one of copartnership, in which it was provided that Bolles should have a three-fourths interest, and O'Brien a one-fourth interest in the business, the profits and losses to be shared accordingly, a provision for a salary to each of the parties for the future being also included. It further appears, that in April, 1910, Bolles brought suit in Florida for the cancellation of this copartnership agreement; that O'Brien filed a cross bill, in which he prayed for an accounting as partners under the agreement; that the trial court decreed a partnership, and ordered an accounting upon O'Brien's cross bill; that upon appeal the Supreme Court

of Florida reversed this judgment with directions to enter a decree annulling the contract, upon the ground that when considered in the light of the law and the evidence, it did not create a partnership or trust in the lands or the profits; that these directions were without prejudice to O'Brien's rights to sue at law upon a *quantum meruit* for his services as attorney, and for moneys paid out for the benefit of Bolles, etc.  See *Bolles v. O'Brien*, 63 Florida 342.

The court permitted the interpolation into this record of certain testimony of one Bensel, given in the Florida suit by way of cross-examination of the defendant's witness Jennings, who had been one of the counsel for Bolles in the Florida suit, and who, prior thereto, claimed to have had business dealings with him in negotiating the sale of certain lands belonging to others.  It is quite apparent that the principal object of his testimony throughout, was to minimize all that O'Brien had done in the way of services for Mr. Bolles, and to fully set forth all that the witness had done in this respect, in order to show that he, Jennings, was the moving spirit in many matters for which he, O'Brien, was seeking compensation.  In his direct testimony, he had intimated that in October, 1908, Bolles knew nothing about The Southern States Land and Timber Company, or its lands.  This was a company which Bensel represented.  On cross-examination he was asked whether he was aware of the fact that in October, 1908, Bolles and O'Brien had gone to Bensel, and negotiated with him about buying some lands, to which he answered: "I don't think so."  He was then asked "You don't think you were aware of it, or you don't think that they did?"  He answered: "I don't think I was aware of it.  I don't think they mentioned it to me at all.  I don't think I had any information about it at all."  He was then asked "Well, if that was the fact, wouldn't it indicate that they were thinking of buying lands, without dealing through you?" to which he answered: "It

is difficult enough, Mr. Smith, to try to recall things that
come within my knowledge, without trying to pass on what
other people are thinking about." He was then asked:
"You didn't know anything about it then?" to which he
answered: "I did not." He was then asked "You know
about it now, don't you?" and answered: "Well, I have
heard it mentioned." He was then asked: "Well, don't you
know it?" Upon objection being made to this question as
had been to the previous ones, counsel for O'Brien said: "I
propose to show, if the court please, by this witness, that
this witness, as counsel for Mr. Bolles, examined and cross-
examined Mr. George F. Bensel, who is mentioned as the
agent of the Southern States Lands and Timber Company,
and that he heard Mr. Bensel testify; that in October, 1908,
Mr. Bolles and Mr. O'Brien came to his office, to the office
of Mr. Bensel, the agent of the Southern States Land and
Timber Company, and entered into negotiations about the
purchase of land, which the witness states was negotiated
for exclusively by himself." The objection was again re-
newed and overruled, the witness proceeding as follows:
"My best recollection is, Mr. Smith, and I refer to the testi-
mony.—" Plaintiff's counsel interposed as follows, "That
isn't answering my question, Governor; you may go on,
though." The witness continuing said: "Mr. Bensel so
testified, and then in the cross-examination said that he
showed these gentlemen the maps of three or four or five
companies of their lands, aggregating up into two million
acres of land, but that neither Mr. Bolles or Mr. O'Brien
said a word to him about buying lands; but if I am mis-
taken, the record is there, and Bensel's testimony is there, to
show it." He was then asked: "You cross-examined Mr.
Bensel yourself, didn't you?" to which, over objection, he an-
swered: "I did, sir." He was then asked "Let me ask
you if you don't recall this examination of Mr. Bensel—this
was examination by Mr. L'Engle:" (O'Brien's counsel in

the Florida case). Over objection counsel was then allowed to read to the witness from what appears to be agreed was the record in the Florida case, some nine or ten questions and answers of the witness Bensel, in that case, wherein he had testified in substance, that previous to December, 1908, O'Brien and Bolles were in his office in Florida, two or three or maybe more times, within two or three months before December, 1908, regarding the December contract and land transaction; that he may have met them together between ten and twenty times; that he went to the office in Jacksonville which they occupied and saw them there; that previous to their taking an office he met them quite often in Jennings' office; that the purpose of the visits of Bolles and his attorney, O'Brien, were that Bolles was negotiating for the purchase of some land, and he dropped in for information and other data, which he had from the office; that the tract of land that he was negotiating for was the tract of 180,000 acres in round numbers; that he did not think he ever furnished him with a list of those lands unless he gave him certain printed maps. To all of which objection was made and overruled, after which the witness answered that he remembered the substance of the questions propounded there, and the occasion as being a part of his, Bensel's, testimony. He was then asked: "Well, he never denied those things that he answered you, did he?" To which the witness replied "I think he did, as the record will show, if you progress; and it will also show that Mr. Bolles did not have an office during the year 1909 in the Dyal-Upchurch building at all." He was then asked: "I will hand you this testimony; it is not very long; won't you please point out where Mr. Bensel changed or modified his entire testimony in that regard at all?" Upon objection being overruled, the witness read about twenty-five further questions which he had propounded to the witness Bensel in the Florida case, and Bensel's answers thereto, all of which talks were concerning lands, and, per the witness' version,

referred to transactions between him, Bensel, and Bolles and O'Brien, after which the witness Jennings was asked: "You have no question now, have you, Governor, that Mr. Bolles and Mr. O'Brien were there discussing the matter of these lands with Mr. Bensel, in October?" After objection overruled the witness answered "I don't understand from that examination that they made any inquiry touching any purchase of any lands."

It is readily apparent that Mr. Bensel's testimony may have been considered by the jury for a two-fold purpose, namely, as tending to impeach the witness Jennings, also as tending to show that he, O'Brien, had performed certain services for the defendant Bolles, which Bolles claimed had been done by Jennings, as testified to by him. We think it was incompetent for either purpose. Mr. Jennings did not state that Mr. Bolles or Mr. O'Brien did not make the visits to Florida, and to Bensel's office referred to, but on the contrary said, "I don't think I was aware of it. I don't think they mentioned it to me at all. I don't think I had any information about it at all." He was then asked if it was a fact, wouldn't it indicate that they were thinking of buying lands, without dealing through him, to which he replied that it was difficult enough to try to recall things that came within his knowledge, without trying to pass on what other people were thinking about. He also admitted that he had heard it mentioned, and that Mr. Bensel so testified, etc. When these admissions were made, the subject should have been discontinued so far as Mr. Bensel's testimony was concerned. Generally speaking, it would be an immaterial matter to this case as to what Mr. Bensel had testified to in the former case, whether permissible by way of impeaching the witness is unnecessary to determine, because it could not be used when he admitted that Mr. Bensel had thus testified at the former trial. The more serious objection is that counsel was, by this method, allowed to get before the jury the testi-

mony of the witness Bensel, given upon the former trial in an issue different from the one here, to facts material to the issues in this case, viz., whether the plaintiff had performed certain services for the defendant concerning the negotiations of certain land sales with Mr. Bensel, which the defendant's witness had denied. To put it in another way, in an effort to contradict the defendant's witness, the plaintiff was allowed to show that another person, in another trial, involving a different issue, had testified to facts which would disclose that he had special knowledge of the particular facts in controversy, and that they were different than testified to by the defendant's witness in this action. This was prejudicial error. *City and County of Denver v. Perkins,* 50 Colo. 159, 114 Pac. 484.

Our Code makes provisions under which the plaintiff, if he desired the testimony of Bensel and could not secure his personal appearance, could have secured his deposition. This was not done. This court has also held that under certain circumstances certain testimony of a witness in a former trial between the same parties and certain others can be read in evidence. *Rico R. & M. Co. v. Musgrave,* 14 Colo. 79, 23 Pac. 458; *Jerome v. Bohm,* 21 Colo. 322, 40 Pac. 570; *Woodworth v. Gorsline,* 30 Colo. 186, 69 Pac. 705, 58 L. R. A. 417. There was no effort to show that this witness was dead or absent from the court or beyond its jurisdiction. 'Tis true the parties were the same, but the question in controversy was different, and had the issue in the Florida suit been the same as the issue here, the line of his cross-examination, as well as his direct, might have been entirely different. As a general rule a party to a litigation has the right to cross-examine a witness pertaining to his testimony upon the issue being tried, but as there was no showing made to bring this testimony within the rule allowing it to be read in a subsequent case between the same parties, we shall not determine whether upon a proper showing it would have been competent to use it at all.

Prior to Bolles' becoming interested in the Florida matter, he had been engaged in the promotion of some kind of a development plan, carried on by The Western Land and Irrigation Company, which owned or controlled certain lands in the San Luis Valley in this state, which lands had been sold by Martin and Borders, on an installment plan basis, or some kind of a scheme somewhat similar to plans afterwards followed by them in selling for Bolles certain of these Florida lands. As tending to show the special skill, experience and ability of O'Brien in matters of this kind, the nature and extent of this work, and the connection of O'Brien with it were gone into fully. The plaintiff, over objection, was then allowed to testify to the amount of Mr. Bolles' investment in this matter, and the relative success that was made of it. It was in substance that Bolles had invested $4,200, drew out $4,200, which represented his original investment, and about $100,000 in profits inside of a year and a half, and besides had as a profit a large interest in a company which owned 100,000 acres of land. Mr. Martin of the firm of Martin and Borders who had sold the land under some kind of a manipulation system, unnecessary to comment upon, testified that to his recollection the entire profits of the Western Land and Irrigation Company, the corporation formed by Bolles and others for this manipulation, were about $225,000, and that these profits were realized in the latter part of 1907. We are of opinion that it was competent to have the plaintiff's experience, skill and ability properly disclosed, and also to show that these facts were within the knowledge of the defendant. *Davis v. Webber,* 66 Ark. 190, 49 S. W. 822, 45 L. R. A. 196, 74 Am. St. 81. But we think it was prejudicial error to present to the jury in a matter not involved in this transaction, and which had been long since closed, the amount of the profit derived from such a small investment, in such a short time as this record discloses was made in this matter, and that it may have had a tendency to prejudice them against the defendant. The plaintiff was not

seeking compensation for this transaction. It was known to the jury that the methods adopted in the Florida manipulations for which the plaintiff was seeking compensation in part were somewhat similar, except upon a broader scale, than this San Luis Valley transaction, and the inference in the minds of the jury might be that a similar result would likely follow in the Florida transactions, for which reason and upon account of his making such enormous amounts upon such a small investment, he should pay his attorney accordingly, regardless of the actual value of the services rendered. This testimony, including the statement as to what the plaintiff was paid in this transaction, was incompetent and it was prejudicial error to admit it. *Wells v. Adams,* 7 Colo. 26, 1 Pac. 698; *Hart v. Vidal,* 6 Calif. 56; *Eggleston v. Boardman,* 37 Mich. 14; *Fuller v. Stevens,* 39 So. (Ala.), 623; Vol. 2, Ency. of Evidence, 166; Vol. 13, Ency. of Evidence, 576.

Over objections Mrs. O'Brien (the wife of the plaintiff), was allowed to testify to a conversation with the defendant Bolles early in February, 1909, pertaining to the contract of January the 19th, preceding. She states that this conversation pertained to the partnership relation between Mr. Bolles and Mr. O'Brien, and particularly the written agreement concerning it. The substance of this conversation was, that she thanked him for the contract; that he said that he was very glad that this thing had come about, that the enterprise was on such a footing as it was, and that he was at last able to do something for Mr. O'Brien, which he had long been wanting to do, etc. In a later conversation in March, following, between Mrs. O'Brien and Bolles, she was again allowed to testify pertaining to the contract, and to Mr. Bolles' repudiation of it wherein, when being asked by Mr. O'Brien as to why he had done this thing, that he, Bolles, said it was too much money for him, O'Brien, to have, and that he gave no other reason for repudiating it other than that it was too much money; that when she told him

Mr. O'Brien was too ill to discuss matters, and that he would have to wait until such a time as he was stronger for any possible adjustment of this thing, that he said to her "What will you do when your husband dies, how can you fight me?" This referred to their contentions over the validity of the partnership contract. Mr. Martin, over objection, was allowed to testify, that in November, 1909, he had a conversation with Bolles in which he said that he had made a mistake with regard to O'Brien, in this business; that he was going to give him one-fourth of the profits; that he had originally intended to do so. Other portions of this conversation with Martin pertained to the contractual relation between the parties under the contract of January 19th, 1909. As heretofore stated, this contract had been cancelled by the Florida court on the ground that O'Brien, occupying the confidential position of attorney for Bolles, had not fully advised the latter of the legal effect of the agreement, and had thereby obtained an undue advantage over his client which ought not to be enforced, and while it is true, as urged, that this judgment was by a divided court of three to two, it was the final determination of that question in an action wherein the court had jurisdiction of both the parties and subject matter, hence must be respected and given effect accordingly. As we understand this decision it left the parties in the same position in which they were prior to the execution of this agreement. Upon account of its execution and the performance by Mr. O'Brien of services thereafter for Mr. Bolles, thought then to be for the partnership, it would be next to impossible to try this suit without having it referred to, yet that portion of these conversations concerning its substance, and the actions of the parties supposedly thereunder, while competent in the former case where its validity was at issue, are incompetent upon the question of the value of the plaintiff's services upon a *quantum meruit* basis.

Plaintiff was allowed to testify to a conversation between the parties preceding the execution of the copartner-

ship agreement of January 19th, 1909. Counsel claim that the negotiations had been merged into the writing of that date, and hence were inadmissible. This conversation took place at Colorado Springs, when it was agreed that Mr. O'Brien should immediately go to Florida with certain selling agents. He was then asked, "What, if any, conversations did you have with Mr. Bolles, either on that day, or at any other time, with reference to your compensation and interest in this enterprise, by reason of your connection with it?" Upon objection to this question account of its dual nature, counsel said "I will modify it by saying, by way of interest as compensation for your services." Upon further objection and by answer to questions by defendant's counsel, the execution of the written instrument was brought out, which Mr. O'Brien admitted had been prepared by him, and had been signed by both parties. The plaintiff's counsel then said that they would consent that defendant might offer the writing, to which defendant's counsel replied "Oh no, I want you to produce the writing," the witness proceeding answered "The first time that we had any conversation, Mr. Bolles and I, with reference to this matter, was on the 19th day of January, 1909. We had had no talk up to that time about my services, about my attorneyship, about what I was to get for my services, or anything of that nature." Q. "Now, what were those conversations; just go ahead?" Counsel for the defendant again objected, and was allowed to ask the witness several questions, as follows: Q. "Mr. O'Brien, was the conversation that you had with Mr. Bolles, as you say, upon January 19th, 1909, specifically with reference to your compensation as attorney, or about your interest in the Florida enterprise?" A. "Yes, it related solely to the manner in which I was to be compensated for my services." Q. "Well, did it relate to an interest that you were to have in the property?" A. "It related—yes, to an interest that I was to get as compensation for my services." Q. "An interest in the property?" A. "An interest in the business. I never

got—" Q. "Now, Mr. O'Brien, immediately after any con-
versations that you had with Mr. Bolles upon the morning of
January 19th, and as the result of that, and I refer to the
conversation such as you have just suggested, respecting
your interest in the business, was a memorandum in writing
prepared by you respecting that matter?" A. "Yes sir.'
Q. "Was that writing signed that morning by yourself and
Mr. Bolles?" A. "It was." Counsel then renewed his
objection. The court then asked "Mr. O'Brien, in that agree-
ment which you say was reduced to writing, rather the writ-
ten agreement of writing, in which you say these oral con-
versations were merged, is that the same instrument which
it is said the Supreme Court of Florida held to be invalid?"
A. "Yes sir." The court then overruled the defendant's
objection. The witness stated that the conversation was
with reference to how he was to get paid for his work, con-
tinuing as follows, "I said to him 'How much of an interest
in this business and partnership, in the profits of it, do you
think I ought to have?' And he said 'One-fifth,' and I said
'I think my interest ought to be larger than that.' I said
'You know you gave Mr. Jennings seventy-five thousand dol-
lars fee for his services, and my work and services in this
matter are greater than his;' and he says 'What do you think
you ought to have, Billy?' And I said 'Well, I think a one-
fourth interest in the profits; a one-fourth interest in the
profits of the partnership, subject to one-fourth of the losses,
would be right;' and he said 'All right,' and he agreed to
that. Then he said, or I said to him, 'How much would it
be right for you to draw out of the business while it is going
on, and how much would it be fair for me to draw out of the
business while it is going on?' * * * And he asked me
what I thought about that, and I said I thought that eight
hundred dollars a month for himself, and four hundred dol-
lars a month for myself, while the business was going on,
something to go on during that time, would be right; and he
agreed to that; and he took up a pen and wrote those

amounts in his copy of the agreement, where that blank was left for that purpose— * * * And I wrote those figures in my copy, which I had in front of me. Then it occurred to me, according to my recollection—he may possibly have brought up the subject, but my recollection is that I did—tween us; and I said, and he agreed to it, that it would be right that all moneys that were required as we went along, to pay for the property, etc., and expenses, etc., might be withdrawn out of the moneys that would come in, before either of us would share in the profits; and that he agreed to; and that was inserted in the document, and then it was signed."

This testimony is not subject to the objection urged and does not come within the rule which counsel seek to invoke. It was not offered to prove the agreement as an obligation. The record discloses that the contract was never offered by the plaintiff, but a copy of it was placed before the jury by the defendant, by his introduction of the Florida decree. This testimony was offered as an admission against interest, viz., pertaining to the value of the plaintiff's services, for this purpose it was properly admissible. The contention that this conversation was merged in the writing, and the writing itself was the best evidence, is not well taken. This action was not based upon the contract. The contention that because the Florida court held the contract invalid, and therefor an admission against interest made by Bolles, was *ipso facto* destroyed, and became a non-existing fact and incompetent for any purpose in this suit, is unsound. The conversation was concerning a lawful matter. The opinion in the Florida case recognizes this and reserves to Mr. O'Brien the right to bring this suit the same as though the contract had never existed. It does not hold that such a contract as this could not have lawfully been made between the parties. The conversation, when considered as a whole, and which was prior to the execution of the contract, was concerning the question of services, and what amount Mr. O'Brien should

be entitled to receive for such services, and while these declarations by Mr. Bolles may be indefinite and uncertain as to amount, yet they were competent for what they were worth in this respect as declarations against interest. We cannot agree that this conversation did not relate to compensation as an attorney at law, but solely as a partner. The conversation referred to what was the reasonable value of the services which the plaintiff had rendered to defendant as his attorney, and in what manner he was to be paid, how it was to be arranged for, etc., the plaintiff stating that he had given one lawyer, Mr. Jennings, $75,000, and that his work and services in this matter were still greater, and that he thought he should have a fourth interest in the profits, etc., and that the defendant agreed to this. The defendant's testimony discloses that he thus understood it. He was asked: "He stated it, didn't he, as a matter of compensation?" To which he answered "Yes sir." Q. "Now what was the language that he used, as closely as you remember it?" A. "Well, it was the merest suggestion of that account. I don't remember anything more than his just saying that some arrangement ought to be made for his compensation, for his services in this work; that it promised to be considerable." Q. "And you said that that was all right?" A. "I said, yes, I thought that was all right; what did he want; and I asked him if he wanted, if he meant a salary; and he said no, that he would rather have an interest in the purchases; and, well, I said 'An interest in the way of stock, such as you had before, in the San Luis Valley Land Company?" And he thought not that, but he would rather have an interest in the purchases, and he says 'I will draw up a memorandum in relation to it.'" The fact that the defendant claims he understood that this conversation concerning a fourth interest referred only to one tract of 67,000 acres of land, does not make the testimony incompetent. The question was whether he had made the admissions or declarations against interest. O'Brien stated that he did, and whether this declaration

concerning the value of his services referred to a part or the whole (which was in dispute), was a question for the jury, whose province it was to give the testimony of each such weight as it thought it was entitled. As sustaining the admissibility of this testimony, we refer to the following authorities.—*Davis v. Webber,* 66 Ark. 190, 49 S. W. 822, 45 L. R. A. 196, 74 Am. St. Rep. 81; *Coonrod v. Madden,* 126 Ind. 197, 25 N. E. 1102; *Street v. Nelson,* 67 Ala. 504; 17 Cyc. 477; *Jack v. McGee,* 9 Pa. 235; *Jenney Electric Co. v. Branham,* 145 Ind. 314, 41 N. E. 448, 33 L. R. A. 395; *La Du-King Mfg. Co. v. La Du,* 36 Minn. 473, 31 N. W. 938; *Clark v. Terry,* 25 Conn. 395; *Buck v. City of Eureka,* 124 Cal. 61, 56 Pac. 612; *Scott v. Congdon,* 106 Ind. 268, 6 N. E. 625; *Randall v. Packard,* 1 Misc. Rep. 344, 20 N. Y. Supp. 716, Weeks on Attorneys at Law (2d Ed.) sec. 345; *Gammons v. Johnson,* 69 Minn. 488, 72 N. W. 563; *Clark v. Mayor, etc.,* 3 Barb. (N. Y.) 288, 1 Ency. of Evidence, p. 391, 1 Greenleaf on Evidence (16th Ed.) sec. 90; *Missouria Glass Co. v. Roberts,* (Tex. Civ. App.) 137 S. W. 433.

Other alleged errors are entitled to consideration; it would unnecessarily prolong this discussion to comment upon them in detail; some can be avoided at another trial; others are without merit. We do not think the statement of Bolles offering O'Brien $20,000, under the circumstances disclosed, was an offer to compromise, so as to prevent its being shown in evidence. We are of opinion that the testimony regarding the circumstances under, and the time when, the plaintiff's services terminated, were competent, except the portion which went into the terms of the partnership, and the contentions over it, but as heretofore stated it cannot be expected that this case can be tried without incidentally referring to the one time existence of this contract; it, of necessity, must repeatedly crop out in connection with the services rendered.

We find no error in the plaintiff's being allowed to testify that he kept no books, and the reasons therefor. We are

of opinion that the testimony concerning the Wray contract, and the subsequent disagreement between Wray and Bolles in regard to it, was proper, as disclosing the services of O'Brien for Bolles rendered in connection therewith.

We cannot agree that the plaintiff was allowed to go beyond the limit of his case in showing the kind of services rendered as defendant claims in a business capacity and not as an ordinary attorney.

In *Turnbull v. Richardson*, 69 Mich. 400, 412, 37 N. W. 499, 505, the court says:

"Attorneys are constantly retained and counseled with by business men respecting the proper conduct and management of their business, so as to avoid complications and difficulties which may lead to litigation; and such advice, given by their attorney or counselor, is as much professional services, for which he is entitled to compensation, as if given in a litigated matter."

In *Graves v. Sanders*, 125 Fed. 690, 60 C. C. A. 422, it was held that business services rendered by an attorney in connection with professional employment should not be separated, but should be considered and allowed for in fixing his compensation. While in the case at bar all the services rendered by the plaintiff technically might not be legal services, yet they were incidental thereto and were in connection with his employment as an attorney by the defendant, and we think he is entitled to recover therefor in this action.—*Ottawa University v. Parkinson*, 14 Kans. 159; *Clark v. Ellsworth*, 104 Iowa 442, 73 N. W. 1023; *Gorman v. Banigan*, 22 R. I. 22, 46 Atl. 38.

We think it competent for the plaintiff to show the market value of the defendant's holdings in the Florida Everglades, which were purchased and partially disposed of during the period of the plaintiff's employment, and, according to the plaintiff's testimony, he acted as his counsel in all matters pertaining to their purchase, their title, the manip-

ulation of their disposition, etc. All of this tended to show the magnitude of their enterprises which the plaintiff was retained to look after; this had a bearing upon the question of his compensation. That the magnitude of the enterprise, and the results attained, are proper factors in determining the measure of compensation to be allowed the plaintiff, cannot be questioned. There was no error in allowing the plaintiff to show the amount received by Bolles through the agency of the Florida Fruits Lands Company (a manipulation company formed by him to operate under), and in permitting the examination of Mathews respecting the receipts of this company; it all had a tendency to show the magnitude of the enterprises in which the plaintiff was acting as counsel for the defendant.

Except as they may have to be modified by the rulings upon which this judgment is reversed, we find no material objections to the hypothetical questions propounded to attorneys as plaintiff's witnesses and think the defendant's complaint concerning the competency and qualification of such witnesses is unfounded.

For the reasons stated the judgment is reversed and the cause remanded for a new trial in harmony with the views herein expressed. The former opinion will be withdrawn.

*Reversed.*

Decision *en banc.*

GARRIGUES, J., and TELLER, J., specially concur.

BAILEY, J., and SCOTT, J., dissent.

TELLER, J., concurring specially:

I concur in the conclusions of the opinion in this case except as to the question of the admission in evidence of the conversation between the parties on the morning on which the partnership agreement was executed. That conversation

was not incompetent because the agreement was subsequently reduced to writing, but the objection that it was not relevant was good and should have been sustained.

The important fact is not that this conversation related to the plaintiff's compensation, but that it related to compensation as a *partner,* who should perform not merely the services of an attorney, but of an owner of an interest in the business, one who might be required to do far more than any attorney would be expected to do. He was to share in the profits, and bear a portion of the losses. He was to give his time and services for a period which was wholly indefinite, and when the enterprise had been carried to completion he was to have his share of the profits, if the business proved ultimately profitable; and if it proved to be a losing venture he must respond with a share of the losses to be paid.

That being the matter to which the conversation pertained, how could it aid the jury to determine the value of plaintiff's services during the term he was employed? How could they say from this testimony what value the defendant placed upon the services which plaintiff had rendered, and would render, as an attorney, up to the time when his employment terminated? Given an estimate of the value of services in a stated capacity for a certain period, it may be properly assumed that services in that capacity, for a longer or a shorter period will be worth a proportional amount.

Here, however, the estimate is as to services in a widely different capacity, and for no period of time which can be even approximately estimated. How then can it be of any value on the issue on trial? The fact that it was an admission against interest, and hence admissible in a proper case, can not make it admissible in this case if it is not relevant to the issue.

The only effect the testimony could have would be to lead the jury to believe that the plaintiff was entitled to a

large share of such profits as they might find had accrued up to the time of the trial.

Its admission was, therefore, highly prejudicial to the defendant, and it should be so held.

Decided March 1, A. D. 1915. Rehearing granted April 5, A. D. 1915. Judgment reversed on rehearing July 6, A. D. 1915.