No. 16,244.

New Mexico Potash and Chemical Company
*v.* Oliver.
(228 P. [2d] 979)

Decided February 5, 1951.   Rehearing denied March 12, 1951.

*En Banc.*

Mr. Justice Hays delivered the opinion of the court.

This is an action brought by defendant in error against plaintiff in error to recover judgment for services rendered by him as an attorney, pursuant to the terms of a contract of employment, and for an order requiring plaintiff in error to pay him a specified percentage of all money thenceforth received by the plaintiff in error company on account of certain royalties, more particularly described in the contract. Judgment was rendered in favor of Oliver, and the company seeks reversal on writ of error.

It is disclosed by the record before us that on May 29, 1940, defendant New Mexico Potash and Chemical Company, Inc., a New Mexico corporation, to which we herein refer as NMCo, entered into a contract whereby defendant in error Oliver, a licensed attorney, was employed to secure on behalf of said company the following:

"1. The direct promise of the Union Potash & Chemical Company to pay the royalty to which we are entitled under agreement with the Texas Potash Corporation, a Colorado corporation, direct to R. B. Walls, as trustee for distribution, or to a bank to be selected by Mr. Walls.

"2. A waiver of any connection the Texas Potash Corporation might have with the payment of royalties, to the end that there would be no claim on the part of the New Mexico Company against them, or on the part of the Texas Company against the New Mexico Potash and Chemical Company. In this connection, we would like

a general mutual release after or simultaneous with a stipulation from the Union Potash & Chemical Company to pay the 4/10th of one per cent royalty to which we are entitled.

"3. There are certain unsettled relations between the New Mexico Potash & Chemical Company and the Carlsbad Potash Company, so-called, and the predecessors of said Carlsbad Potash Company which we would like to have definitely closed by a release of some type. In that connection we would not expend any money, same being covered by contingent of sixteen and two-thirds per cent provided herein."

For such services it was agreed, under said contract, that Oliver should receive sixteen and two-thirds per cent of the royalty interest mentioned in the contract, if and when paid. The trial court found that Oliver did secure the direct promise to which reference is made in the first paragraph of the contract, and also the mutual releases mentioned in the second and third paragraphs of said contract, as above set forth.

The trial court found further, in substance, that no fraud or conspiracy was shown; that there was no breach of trust or fiduciary relationship by either Oliver or the committee; that the committee and Oliver acted in good faith; that the contract was neither unconscionable nor unfair, and that it was fully performed by Oliver. Our examination of the record satisfies us that there was ample evidence to support each of the above findings, and, under our often-repeated rule, we are not at liberty to disturb them.

It first is contended as grounds for reversal of the judgment that the stockholders' resolution creating the so-called auditing committee, was contrary to the statutes of New Mexico, the certificate of incorporation, and by-laws of the company, and by reason thereof, the alleged contract of employment is not binding on the company. In this connection it is urged that the applicable corporation laws of New Mexico vests in the

directors of a corporation the power to manage its business and, "upon dissolution in any manner of any corporation the directors shall be trustees thereof with full power to settle the affairs * * * " of the corporation; that the certificate of incorporation of the company provides: "The powers of this corporation shall be conducted by a board of directors * * * ", and that the by-laws of the company provide that the board of directors, not this committee, shall have entire charge of the property, business interests and general operations of the company.

It appears from the record before us that the last meeting of the board of directors prior to June 16, 1941, was held July 25, 1936, notwithstanding the fact that the by-laws of the company in terms provided that such meetings shall be held at 10:00 a.m. on the first Monday of each month without previous notice thereof having been served; that during the above period the stockholders' committee exercised absolute control and management of the company; that while directors elected at the meeting of June 25, 1936, nominally remained in office until July 16, 1941, none of them during said period, save Wall and Beacham (who also served as members of the auditing committee), took any active part in the management and affairs of the company, but, on the contrary, permitted the committee to assume complete charge of the company. It is to be noted in passing, that four of the directors signed the minutes of the meeting of the stockholders at which said resolution was adopted.

. The notice of the calling of the special meeting of the stockholders held August 17, 1936, signed by the president and secretary, contained the following:

"To the Stockholders of the
New Mexico Potash and Chemical Co., Inc.

"At 10:00 A.M. on July 20, 1936 the Annual Stockholder's Meeting called by our President, Geo. E. Montgomery, was held at 601 N. Canal Street. A canvass of

votes and proxies present showed insufficient representation was available to legalize the Meeting. A Round-Table Discussion was then had with reference to the future functions of the New Mexico Potash and Chemical Company, Inc., which holds a stock interest of one hundred and fifty thousand shares of stock in the Independent Potash and Chemical Company, of Oklahoma City; also a Royalty Interest with the Texas Potash Corporation, of Denver, Colorado. By popular accord it was decided to abandon the functions of New Mexico Potash and Chemical Company, Inc., taking in lieu thereof our pro rata interests in the stock of the Independent Potash and Chemical Company; and our pro rata Royalty Interests with the Texas Potash Corporation.

"By the above action the New Mexico Potash and Chemical Company, Inc., would make a saving of an operating or administration expense of from five thousand to ten thousand dollars per year, passing this direct to our stockholders as of record on our stockholder's ledger; and make possible the transfer of New Mexico Potash and Chemical Company, Inc., stock for Independent Potash and Chemical Company stock. Then, in the case of the other operating Company, or the Texas Potash Corporation, our royalty interest due our stockholders could be administered by the Texas Potash Corporation, without the necessity of our maintaining an office organization of our own at an expense as outlined above to perform this duty.

"On August 17, 1936 at 10:00 a.m. another Annual Stockholders' Meeting is called by your President, Geo. E. Montgomery to be held at 601 N. Canal Street, Carlsbad, New Mexico. At this Meeting it is desired that every available share be represented. A proxy is enclosed herewith and if, for any reason you are unable to attend this important meeting on the above date, do not fail to appoint a proxy of your own choice to act in your behalf, and mail promptly to the Office at Carlsbad,

New Mexico so that your interests may be protected in the best way we, as a body of stockholders, may determine for all concerned. We might add that your stock interests will be best protected in accordance with the wishes of the majority present at this meeting."

The minutes of the special stockholders' meeting held August 17, 1936, contain the following:

"A Motion was made by E. J. Fox, seconded by W. J. Peveler, that the President appoint a Stockholders' Auditing Committee consisting of not less than three stockholders to act for the best interests of all stockholders concerned and to make an equal distribution of the assets of record to the stockholders, individually, as their interests appear. This Committee, as appointed, consists of Wm. Beacham, E. B. Wheeler, T. A. Whelan and R. B. Walls. This Committee was given full power to make an equitable adjustment of the assets, both stock interest in the Independent Potash and Chemical Company; and the Royalty from the Union Potash and Chemical Company; as well as the office equipment and such other assets as they may find on hand; and to handle such other business as may come up and which in their judgment is for the best interest of the stockholders of the New Mexico Potash and Chemical Company, Inc; that a copy of this Motion be transmitted to each of the operating Companies that there shall be no misconstruction of the interest or functions of the Stockholders' Auditing Committee from any source. This Committee shall be further intrusted to list any and all outstanding obligations incurred prior to this Meeting or in the process of distribution of the Assets, said amounts to be paid from the first royalties, if and when due, from the Union Potash and Chemical Company, and to be payable direct to such creditors; provided no other cash is available prior to that time. * * *

\* \* \*

"Motion was made by Dr. J. W. Muir, and seconded by Wm. Beacham, that the Meeting adjourn, as there was

no further unfinished business, as a Company; *all further action being vested in the Stockholders' Auditing Committee; herein appointed."* (Italics supplied)

The above minutes were signed by Geo. E. Montgomery, president; Geo. Edgar, 1st vice-president; Wm. Beacham, 2nd vice-president; and R. B. Walls, acting secretary.

The by-laws of NMCo, as authorized by the statutes of New Mexico, provide that the board of directors may appoint an executive committee, which is authorized to exercise all the powers of said board in the management of the company's affairs between meetings of the board. As indicated above, no meeting of the board was held between July 25, 1936, and June 16, 1941, during which time the contract of employment was made and performed.

Under the statutes of New Mexico, the certificate of incorporation and by-laws of the company, considered in their entirety, and in the light of attending circumstances and purposes to be accomplished, we are convinced that the resolution adopted by the joint meeting of the directors and stockholders was not contrary to, or in violation of, the applicable provisions of said laws, certificate and by-laws.

It next is contended that even though the resolution creating the auditing committee was valid, nevertheless such committee was without authority to enter into an employment contract with Oliver, since the resolution in terms does not specifically authorize the employment of an attorney, and if authority to do so existed, it must be implied from the powers expressly granted the committee.

The object of creating the committee, as expressed in the notice of the meeting at which such resolution was adopted, was, as above indicated, to "abandon the functions of New Mexico Potash and Chemical Company, Inc., taking in lieu thereof our pro-rata interests in the stock of the Independent Potash and Chemical Company;

and our pro-rata royalty interests with the Texas Potash Corporation.", which as said, "would make a saving of an operating or administration expense of from five to ten thousand dollars per year, passing this direct to our stockholders."

Thereafter, Union Potash and Chemical Company, a Colorado corporation, was formed, and took over the assets of the Independent and Texas companies; whereupon, doubts arose as to whether or not the obligations on the part of the Texas company to pay royalties to NMCo was enforcible against the new corporation.

The auditing committee was authorized and directed in the resolution adopted by a majority of the stockholders and four of the six directors "to act for the best interests of all stockholders concerned and to make an equal distribution of the assets of record to the stockholders, individually, as their interests appear."; it "was given full power to make an equitable adjustment of the assets, both stock interest in the Independent Potash & Chemical Company, and the Royalty from Union Potash and Chemical Company; as well as the office equipment and such other assets as they may find on hand; and to handle such other business as may come up and which in their judgment is for the best interest of the stockholders * * * "; and finally, the committee was directed "to list any and all outstanding obligations incurred prior to this meeting or in the process of distribution of the Assets, said amounts to be paid from the first royalties, if and when due, from Union Potash and Chemical Company, and to be payable direct to such creditors; provided no other cash is available prior to this time."

The committee, as above indicated, was given broad powers to do such acts and things as in its judgment were necessary or required to wind up and settle the affairs of the company, and it was clearly in contemplation by said resolution for the incurrence of debts in the process of distribution, such as here considered, and

that authority to do so was incidental to, and implied from, the powers expressly conferred.

In support of the above conclusion is an annotation in 130 A.L.R. 894, 895, from which we quote as follows: "It is apparent, therefore, that whether corporate officers have authority to employ attorneys for the corporation depends upon the circumstances involved in the particular cases. However, it would seem that where such officers have charge of the management of the corporation, the power to employ counsel on behalf of the corporation for the purposes and the interests of the corporation is usually implied. Thus, it has been held that the managing officers and agents of a corporation, in the absence of some prohibition in that respect, have the power and authority to employ attorneys to prosecute and defend suits for the corporation, or otherwise assist in legal proceedings in which it is interested, without any express delegation of power, or any formal resolution of the board of directors to that effect."

■ In addition to the foregoing, and as further justification for affirming the judgment of the trial court, the evidence is undisputed that subsequent to the contract of employment of Oliver and the securing of the direct promise of Union to assume and pay the royalties as previously agreed upon between NMCo and the Texas company, royalty payments were made beginning in October, 1940, and continued to the date of the trial. The committee made payment to Oliver of one-sixth of said royalty payments on account of his fees, pursuant to the employment contract, to April, 1941; but it thereafter failed and refused to make further payments even though said committee and the NMCo continued to accept the benefits resulting from legal services rendered by Oliver in negotiating and obtaining the contract between Union and NMCo. Under well-settled principles of law the company could not accept the benefits and repudiate the contract.

This rule is aptly stated in 13 American Jurisprudence,

page 936, section 984, from which we quote: "Sec. 984. It is the well-established general rule that a corporation which, with knowledge of its officer's or agent's unauthorized act or contract and of the material facts concerning it, receives and retains the benefits resulting therefrom thereby ratifies the transaction if it is one capable of ratification by parol. This rule has been applied in many different kinds of transactions, among which are the following: Contracts of employment of servants and of agents, brokers, or attorneys; * * * "

We approve this rule in *Dick v. Petersen*, 90 Colo. 83, 6 P. (2d) 923, in which we adopted the following statement contained in an earlier opinion from *Moffitt-West Drug Co. v. Lyneman*, 10 Colo. App. 249: " 'There is no principle either in law or in morals which will permit a principal to repudiate the act of his agent and keep the fruits of the act in his pocket. This is precisely what the defendant tried to do.' "

Other questions raised in the briefs, including those based upon cross specification of points, have been considered and found to be without merit.

The judgment is affirmed.

Mr. Chief Justice Jackson and Mr. Justice Stone dissent.

Mr. Justice Alter not participating.