In the Matter of KING RESOURCES
COMPANY and International
Resources Limited, Debtors.

Joel Mallin, Claimant.

Bankruptcy Nos. 71–B–2921, 72–B–644.
Claim No. T–487.

United States District Court,
D. Colorado.

April 15, 1982.

Gorsuch, Kirgis, Campbell, Walker & Grover by John S. Pfeiffer, Stephen Klein and Ann Devine, Denver, Colo., for debtors.

Shank, Irwin & Holmes by Roger Goldburg, Denver, Colo., for claimant.

## MEMORANDUM OPINION

WINNER, Senior District Judge.

This is but one of a long line of cases arising out of the attempted take-over of Investor's Overseas Services (IOS) by King Resources Company (KRC) and the subsequent bankruptcy reorganization of King Resources Company as Phoenix Resources.

The matter currently before this court concerns the claim of an attorney, Joel Mallin, for legal fees and reimbursement of out-of-pocket disbursements. During the spring and summer of 1970 (the time period of the attempted take-over), Mallin was a partner with the firm of Roth, Carlson, Kwit, Spengler & Mallin (hereinafter Roth-Carlson) in New York. It is alleged that this firm, through Mallin, was retained to perform, and did perform legal services for KRC for which it was never paid. The firm (now Roth, Carlson & Spengler) has assigned to the claimant, Joel Mallin, its right to assert a claim against KRC. Mallin filed a proof of claim against KRC in the amount of $115,390.21. The Trustee filed his objection to allowance of the claim on grounds that: no attorney-client relationship has been established so as to create an obligation on the part of KRC; Mallin engaged in the representation of entities or persons with interests adverse and conflicting to KRC so as to preclude his being awarded fees; Mallin failed to meet his burden of proof as to the reasonable value of services rendered; and, the claim for legal fees should be equitably subordinated to the claims of all other KRC creditors. Aside from contesting the Trustee's position, Mallin claims the burden of proof was on the Trustee to prove the invalidity of the claim and that the burden was never met.

Pursuant to a special order of this court, the matter was heard by a Special Master in June 1978. (Folio) By report dated September 13, 1978, the Special Master made findings and allowed Mallin's claim in the principal amount of $50,000.00. He found that there was substantial evidence that extensive and intensive services had been rendered by Mallin and his firm on behalf of KRC, and that the services were legal in nature and compensable. However, finding the billing to be based on "excessively liberal expenditures, subsequently charged to KRC as reimbursable, and overly generous assessment of actual time devoted to KRC's services", the Special Master placed a value of $50,000.00, "as more realistic" on the services rendered.

The cases cited by the Special Master in support of his finding offer little insight as to how the $50,000 figure was reached. For the most part, the cases relate to the qualified standard of review to be applied by a reviewing court. It is axiomatic that findings of fact by a lower tribunal are binding on a reviewing court when substantially supported by the evidence. See e.g., Bryant v. Hand, 158 Colo. 56, 61, 404 P.2d 521 (1965). The same standard applies where, as in the instant case, the matter has been referred to a special master. See, F.R.C.P. 53(e)(2) ("the court shall accept the master's findings of fact unless clearly erroneous"). In each of the cases relied on by the Special Master in this case, the reviewing court found substantial evidence to support the findings of the lower court. See e.g., Featherstone v. Barash, 382 F.2d 641 (10th Cir. 1967); Stein v. Hemker, 157 F.2d 740 (8th Cir. 1946); Bryant v. Hand, supra.

Although some of the cases articulate factors to be considered in evaluating the "reasonableness" of fees assessed, and may be of value in analyzing a case; see e.g., Featherstone v. Barash, supra, these cases primarily serve to illustrate that each case involving what an attorney is entitled to recover as a reasonable value of his professional services must be governed by its own facts and circumstances. Id. at 644. Among factors properly to be considered are the nature and extent of services rendered by the attorney, the time necessarily consumed, the attorney's professional skill and experience, and the results accomplished. Id. If such an analysis was engaged in by the Special Master in this case, it is not apparent from the written report. There is nothing to indicate on what the ultimate figure of $50,000.00 was based, or how it was derived. Consequently, I declined to adopt the findings and conclusions of the Special Master and set the matter for further hearing. See F.R.C.P. 53(e)(2). July 18, 1979, further testimony was presented and prior transcript and exhibits from the hearing before the Special Master were received. (Transcript) A final hearing was held February 22, 1980, supplemen-

tal briefs were received, and the matter was taken under advisement.

Extensive review of the file and transcripts has served to increase my sympathy for the plight of the Special Master in attempting to conduct a rational analysis of the legal rights and liabilities in this case. However, a determination is necessary, and based on the evidence before me, I make the following findings of fact and conclusions of law as required by Rule 752 of the Bankruptcy Rules.

The relevant facts are complex. On April 25, 1970, Edward Cowett, then President and Chief Operating Officer of Investor's Overseas Services, Ltd. (IOS), informed Joel Mallin, a New York attorney, of his authorization from the IOS Board of Directors to seek a merger with KRC. IOS consisted of a complex of companies in the business of investments (offshore mutual funds). The IOS mutual funds sought out investment opportunities and IOS had become the largest customer for sale of investments in the oil, gas and minerals produced by King Resources and its support companies (the history and general structure of the King enterprises is set forth in *King v. United States, 545 F.2d 700 (10th Cir. 1967)*). IOS had been encountering management and financial problems and it was suggested King attempt to form a consortium to acquire control of the multi-billion dollar Investors Service Company. To make a very, very long story very short; a take-over was attempted, was unsuccessful, and resulted ultimately in financial problems for KRC which in turn led that company into bankruptcy reorganization proceedings.

Mallin seeks compensation for his participation, and the participation of his firm (Roth-Carlson), in the attempted take-over. Mallin's involvement began in the early spring of 1970 when he received a call from Edward Cowett in Geneva. By way of background, Mallin had done some personal tax planning for Mr. Cowett in the early 1960's and later had been engaged by IOS to do personal tax planning for all of its other key executives. In April, 1970, Cow-

ett informed Mallin he wanted to come to New York to discuss KRC and IOS. Mallin was familiar with the operation of KRC by virtue of personal and family tax planning he had done for several KRC executives including John M. King (Chief Executive Officer and Chairman of the Board of KRC), Roland Boucher (President) and Harding Lawrence (Director); he had also participated in drafting documents creating certain trusts in the Bahamas for King's children and in tax structuring for the Colorado Corporation (a separately incorporated entity controlled primarily by King which engaged in the acquisition, sale and development of oil, gas and mineral properties for KRC).

Mr. Cowett told Mallin that IOS had serious cash flow problems; that while the funds that they managed for investors had 4.5 billion dollars in them, this money was not available for the operating use of IOS and that a recent public offering had left them cash poor. He further informed Mallin that he had been authorized by the Board of Directors of IOS to enter into direct negotiations with John King and KRC in an attempt to effect an amalgamation of the two companies. Mallin testified at the September, 1979 hearing that he assumed Mr. Cowett had contacted him "because I was one of the few people that understood the structure of IOS in terms of the fact that it was at that time a Canadian Corporation, having been switched from Panama, with subsidiaries all throughout the world.

"I was also—had some knowledge of King Resources and their corporate structure, and in my [sic] amalgamation of the two companies, the tax problems and the jurisdictional problems would have been a matter of great magnitude, and it was obvious that they would need somebody to be able to advise with respect to this amalgamation if it were to take place." (Tr. at 30, 31)

At this same meeting, Mr. Cowett described to Mallin the terms that were to be proposed by the IOS Board. Specifically, IOS wanted repayment of $10 million dol-

lars in loans that had been made by IOS to trusts set up in the Bahamas for Mr. Cowett's and Mr. King's children. Mallin referred to this portion of the proposed transaction as "key money" or money that would have to be forthcoming before the acquisition could proceed. The loans to these "Bahamian" trusts had been made for the purpose of IOS stock, and were secured by that stock. KRC's assumption of these loans would give IOS immediate operating cash and eliminate the conflicts it perceived as inherent in allowing the acquisition to go forward when IOS had loans outstanding to trusts in which both King and Cowett had interests. (Tr. at 44; Claimants Ex. L) A second condition to the take-over required KRC to provide for a loan of $20 million, at which point a voting-trust would be created to give King Resources control over IOS. A third $20 million was to be made available as a back up line of credit through a reputable financial institution, completing the transaction/take-over. (Fol. at 228)

Apparently, while meeting with Mallin, Edward Cowett called John King and a meeting was arranged for that evening (April 25, 1970) in Denver. Cowett and Mallin were flown to Denver in King's learjet. Upon their arrival, Cowett and Mallin met with Messrs. King, Lowry, Boucher and Bennet King, among others. Mr. Lowry was general counsel for KRC and had formerly dealt with Mallin when representing John King in a personal capacity and when representing the Colorado Corporation. Mr. Lowry was also the trustee for domestic trusts set up for King's children. During this meeting, Mr. King made a call to Geneva to verify Cowett's authority to enter into negotiations, and the possible amalgamation was discussed. It was agreed that the take-over would be attempted based on the conditions stated in the IOS proposal as set forth above. A letter agreement was entered into by Cowett and King on April 29, 1970. (Trustee's Ex. 1) This letter agreement made no reference to the transaction whereby KRC would provide for repayment of the IOS loans to the Cowett and King Bahamian trust, but otherwise embodied the understanding as proposed by Cowett.

Sometime during the evening meeting, after the decision to attempt the take-over had been made, John King asked Mallin to represent KRC as special counsel. It was suggested Mallin advise various representatives of KRC as to the facts involved and its rights with respect to the potential merger, and involve himself and his firm in the project of raising the money necessary to consummate the amalgamation. (Tr. at 36) In fact, Mallin was "to do everything that would be necessary to accomplish the take-over of IOS" (Fol. 237); the Roth-Carlson offices to serve as a "central command post" during the take-over operation. (Fol. 59) John King thought Mallin to be well qualified to advise KRC because of his familiarity with all the "players." (Tr. 168) As well as his familiarity with IOC and KRC, Mallin had participated in establishing the Bahamian trusts for both Cowett and King and had represented the Mercantile Bank and Trust Company (Trustee for the Bahamian childrens' trusts) in its New York affairs. In addition, it was clear KRC would need to work through a loan broker in raising the money for the acquisition of IOS, and it appeared likely the services of Delafield Capital Corporation in New York would be sought in this capacity. Delafield was a client of Mallin's and had been suggested as a financier by Mallin; in fact, Cowett and Mallin had been in touch with Mr. Frankel, President of Delafield, about the possible involvement of that company before leaving New York for the April 25, 1970 meeting in Denver. Delafield eventually was brought into the transaction. Mallin claims that all participants were aware of the fact that he had represented most of the parties involved in the acquisition. He further claims that he agreed to represent KRC in the amalgamation attempt only after *full disclosure* of the potential conflicts had been made and consent of the relevant parties had been secured. (Tr. 38) The sufficiency of this disclosure is raised as a legal issue in this case and will be discussed at length later in this opinion.

It is Mallin's testimony that King agreed to Mallin's firm charging their normal hour-

ly rate plus disbursements with the additional understanding that if the take-over was successful a large bonus would be forthcoming. (Tr. 46) Pursuant to this agreement, it is Mallin's contention that his firm performed in excess of 1100 hours of services on behalf of KRC for which they were not paid. Records of KRC show that a bill was submitted by Mallin to KRC on July 23, 1970 totalling $113,797.70 including professional services in the amount of $104,000.00 and disbursements in the amount of $9,797.70. The portion covering disbursements was approved by KRC but the fees for legal services were not. An additional bill for disbursements in the amount of $1,592.51 was submitted and refused. Thus, the total amount claimed is $115,390.21. Whether or not John King had the authority to retain Mallin (and the firm of Roth-Carlson), or whether an attorney-client relationship was ever established between the firm and KRC are legal issues which will be addressed hereafter. In any event, it is clear that John King requested Mallin's services and Mallin accepted with the understanding that he would, in effect, be coordinating the entire take-over from Roth-Carlson's New York offices, while working personally, primarily in a money-raising capacity. (Fol. 59)

At the initial Denver meeting, potential problems with the Securities Exchange Commission were discussed. A 1967 consent decree forbade IOS from controlling or being affiliated with any public company in the United States. The consensus at the Denver meeting was that this consent decree also forbade a reverse affiliation (i.e. a United States corporation such as KRC, taking over IOS); and so, it was determined that the documents involving the transaction would be drafted in John King's name until such time as the SEC could be contacted and their position made clear. The understanding was that, if the SEC could be persuaded to modify the consent decree and endorse the take-over, King would assign KRC the interest in the IOS acquisition. (Tr. 34) Accordingly, the letter agreement entered into April 29, 1970 between King and Cowett was written on King's personal stationery and contained the following language:

"6 (b) It is my intention to consult with the U.S. Securities and Exchange Commission ("SEC") for the purpose of (i) causing a realistic modification of the Settlement Order of May 23, 1967 and (ii) obtaining any requisite approval for the transfer to me or to King Resources Company or its subsidiaries of all the rights and interest in respect of I.O.S., Ltd. obtained by me and Harding Lawrence in accordance herewith. If, as and when such requisite approval is obtained, I will offer King Resources the opportunity to acquire all of such rights and interest at my cost basis. In entering into this transaction I am now acting for my own account, but for the ultimate beneficial interest of King Resources Company (assuming approvals by the directors of King Resources Company and the SEC.)"

(Trustee's Ex. 1) It is clear the original "deal" contemplated approval by both the KRC Board of Directors and the SEC. Whether the KRC Board of Directors ever ratified the agreement, specifically that portion providing for the payoff of the Bahamian Trust loans, or agreed to representation in the transaction by Mallin, are issues which are in dispute. Approval by the SEC was not forthcoming in a timely manner, and apparently this impaired KRC's ability to raise the requisite interests and funds to consummate the transaction. (Fol. 285, 350–353) KRC found itself improverished and indebted as a result of the attempted take-over and ultimately sought reorganization.

It is Mallin's testimony that neither he nor his firm had anything to do with the decision to attempt the take-over and that they did little in the area of working with the SEC; in fact, Mallin's work initially had nothing to do with the provisions as set forth in the April 29, 1970 letter agreement. (Tr. 35–37) Mallin and others of the firm of Roth-Carlson began work satisfying the first condition as proposed by IOS: the payment to IOS affiliated banks of approximately $10 million, representing the

amount of the loans to the Bahamian trusts. The firm was responsible for drafting approximately 20 to 25 documents and raising funds in connection with this transaction. (Fol. 259, 260) These documents were drafted primarily by Leonard Gubar, a partner with Roth-Carlson, with the assistance of Edward Linden, an associate. Roth-Carlson was principally engaged in this activity through May 5, 1970, by which time the "key money" had been raised, the Bahamian Trust loans paid off, and thus the condition satisfied. Mallin and his associates then focused on the provisions set forth in the letter agreement, the first being a loan of $20 million to IOS. Again, numerous documents were drafted by members of Roth-Carlson, subject to review by Mallin. William Fishman, a KRC employee, was instructed by John King to go to New York to work on the IOS matter under Mallin's supervision. The record is replete with testimony of the long hours spent during this time in raising money, drafting and reviewing documents. (See, e.g. Tr. 57) By May 13, 1970, the date the $20 million was due, only $8 million could be raised. At this point the take-over agreement was renegotiated. IOS extended the time for KRC to raise the additional $12 million; and, in the event a total take-over could not be accomplished within the extended time, IOS authorized KRC to designate three representatives of the IOS Board of Directors, the loans to become 13 month notes payable to KRC. (Fol. 116) By late May, 1970, it became clear the SEC would not issue a "no action" letter endorsing the KRC take-over of IOS, (Fol. 285) and would give KRC no indication of the applicability of the 1967 consent decree prohibiting involvement of American interests in IOS without prior extensive investigation. This fact, coupled with KRC's increasing difficulty in raising the $12 million, forced KRC to accept the compromise option, attempting to secure its interest in IOS by continuing the acquisition as a junior rather than as a senior partner. (Fol. 350–353) Pursuant to the new understanding, Leonard Gubar was designated for a short time as one of three representatives assigned by KRC to the IOS

Board. Mr. Gubar received no independent compensation from IOS for his directorial services, and his time spent in this capacity was included in the time billed to KRC. (Fol. 119, 120) No "senior" partner was found and the take-over attempt was eventually abandoned. Therefore, the time expended by Mallin and the others at Roth-Carlson after May 23, 1970, was primarily related to "cleaning up" the loans incurred in the original $10 million Bahamian Trust transaction, and trying to recapture for KRC whatever monies they could.

I. Burden of Proof

Both parties contend that the other has the burden of proof on whether or not the claim should be allowed, and both contend the other's burden has not been met. In bankruptcy proceedings, "a proof of claim must be treated as some evidence. It is strong enough to carry over a mere formal objection—that is, a mere statement that the claim is invalid—and it compels the objector to go forward and produce evidence enough to rebut the claimant's *prima facie* case. Yet once this is achieved, it is for the claimant to prove his claim, not for the objector to disprove it." *3 Collier on Bankruptcy ¶57.18(5); Bankruptcy Rule 10–401(b)(4).*

In the instant case, Mr. Mallin's claim was properly filed, thus constituting *prima facie* evidence of the validity and amount of debt under Bankruptcy Rule 10–401(b)(4). The Trustee filed a formal objection. Obviously the objection in and of itself is a mere statement of invalidity and insufficient to contest the *prima facie* case. A trustee must document his objection with probative evidence to satisfy his burden of going forward. *In the Matter of the Colorado Corporation, 531 F.2d 463 (10th Cir. 1976).* In this case, the Trustee introduced the testimony of William Coffey, former Executive Vice President of KRC, to show what the books of KRC showed was owing to Mallin. (Fol. 12–38) The books reflect a debt of $9,797.97 to Joel Mallin, this being the amount of disbursements submitted in the July 23, 1970 bill. See Trustee's Ex. 46.

In addition, Mr. Coffey testified as to the procedures followed in the ordinary course of business by KRC in approving or disapproving an invoice for attorney fees. (Fol. 24) He testified that the bill submitted by Mallin was disapproved as to legal services by Mr. R. L. Davis, head of KRC's accounting department in the ordinary course of business as described. The Special Master ruled that William Coffey was competent to testify as to this matter, and I agree. (Fol. 28) See, Federal Rules of Evidence 803(6). Although the Trustee offered no other affirmative evidence, the testimony of Mr. Coffey, together with the disapproved bill, is sufficient to shift the burden back to the claimant, Mallin, to prove the validity of his claim against KRC. What the evidence shows is that the amount owed Mallin was disputed by KRC before reorganization. The purpose of requiring an objecting trustee to produce probative evidence to call a claim into question is to prevent a Trustee from subjecting creditors to unnecessary expense, delay and embarrassment which would result if a formal objection, a "mere statement that the claim is invalid", without evidence of a true dispute on the merits, were considered sufficient. *See e.g., Whitney v. Dresser, 200 U.S. 532, 535–6, 26 S.Ct. 316, 317, 50 L.Ed. 584 (1906).* The Trustee produced sufficient evidence to show that a true dispute did exist between KRC and Mallin in this case as to the amount owed. The burden properly rests on the claimant to proceed with evidence as to the merits of his claim.

The Trustee's contentions that Mallin has failed to meet his burden will be dealt with in the context of the legal issues. Before proceeding, it should be noted that the agreement between Mallin and John King concerning Mallin's legal representation of KRC took place in Denver, Colorado, and since the principal office of KRC was located in Denver, Colorado law is applicable as to the validity of Mallin's claim. In any event, the application of Colorado law in this case has been stipulated to. (Tr. 6)

## II. Attorney-Client Relationship

It is necessary to determine whether an attorney-client relationship was ever established between Mallin and KRC. This brings into focus questions of whether John King, as Chief Executive Officer of KRC, had actual or apparent authority to hire an attorney for the company; whether the hiring required ratification by the company, and if so, whether such ratification occurred; and whether the work Mallin had been hired to do involved such conflicts of interest between KRC and John King that Mallin should have been put on inquiry that King had no authority to retain counsel for such purposes.

Colorado law is clear that an agent can retain counsel on behalf of his principal. *Commercial Standard Ins. Co. v. Rinn, 100 Colo. 76, 65 P.2d 705 (1937).* Certainly a corporate officer is such an agent and a chief executive officer has implied actual authority to retain attorneys on behalf of the corporation. *New Mexico Potash & Chemical Co. v. Oliver, 123 Colo. 268, 228 P.2d 979 (1951).* However, the Trustee argues that there are extraordinary circumstances in this case demanding scrutiny beyond King's implied actual authority. The Trustee's position is that John King stood to gain personally by the payment of the Bahamian trust loans by KRC as a condition to the take-over of IOS, and that this interest divested him of any authority he might otherwise have had to retain counsel in the matter. The argument continues that Mallin was aware of the conflict of interest and the consequent divestment of authority, and was thereby put on notice that he could not be properly retained by King without ratification by the company.

The Bahamian Trusts had been created for the benefit of Cowett's and King's children. $10 million was loaned to the two trusts by IOS banks for the purchase of IOS stock. Being in a cash poor position, IOS was interested in collecting on the loans and proposed KRC pay off the loans as part of the take-over. (Tr. 44) Mallin testified that there was no direct benefit to KRC for paying off the loans, other than the receipt

of the opportunity to proceed with the takeover. (Tr. 40, 41) He also testified that there would be no benefit to the King family by the payment of the loans, despite the fact that the King children were the beneficiaries of one of the trusts. (Tr. 41–43) On the other hand, additional testimony by Mallin indicates that there was a conflict of interest to be dealt with:

"Q. (By Mr. Goldburg) In connection with the payoff of the trust loans which was, as we have described it, a condition or one of the conditions or provisions of the deal that was to ultimately be made, did you or anyone else in King Resources or IOS perceive a conflict of interest between the beneficiaries of the trust and King Resources and Mr. King?

"A. Yes, sir.

"Q. Okay. What was this perception?

"A. I believe it was Mr. Lowry who first raised it but I'm not totally sure. The perception was that if King Resources, in essence, paid off the loan, they would have a rather large batch of IOS shares as collateral. If they were subsequently successful in taking over IOS and restoring the market value of the IOS stock, then the beneficiaries of the trust would—could get—derive great profits after paying off the $10 million loan. At the time of the transaction occurred, that is at the time the $10 million loan was paid off, the value of the stock in the trust was less than $10 million dollars so that the loan was, in essence, under water vis-a-vis ODB [the IOS bank] and/or anyone who came into [the bank's] shoes, and Tim [Lowry] felt—and I think quite rightly—that if the price of the stock rose and a profit was to be made, that that profit should not go to the beneficiaries of the trust but should rather go to King Resources for having taken the risk of paying off the loan, and I believe Mr. Bye was in on the discussion, certainly Mr. King was there and I was there." (Tr. 49, 50)

■ This testimony makes it clear that the beneficiaries of the trust stood to benefit from the payment of the trust loans and

that Mallin was aware of that fact. The beneficiaries being King's own children, it is equally clear that he had a personal interest in the repayment. The question then is whether this interest divested King of his authority to hire Mallin. If the discussion outlined in Mallin's testimony above were all the evidence before this court, there would be little doubt that Mallin could be deemed to be on inquiry as to the propriety of King's actions. An agent is not vested with the authority to appropriate the funds of his principal to pay his debts; therefore, one receiving benefits has notice and must establish authorization or ratification. *De-Baca v. Higgins, 58 Colo. 75, 143 P.2d 832 (1914).* One in Mallin's position, hired to accomplish the fact of payment of the agent's debt, or a debt he has an interest in seeing repaid, should be held to no less standard. However, the conversation related by Mallin in his testimony before this court continued:

"And Mr. Lowry drafted the—did a draft of the option to acquire all of the stock in the trust over and above the paying off of the loans for an amount which was equal to the cash that had originally been in the trust prior to the existence of the loans, plus some interest factor—some relatively modest interest factor.

"I remember that Mr. King was trying to up the option price because he wanted to keep more in the trust and I remember the argument he was having with Mr. Lowry, who said in order to be at arm's length, you've got to severely limit any benefits that were sold to the trust from this transaction; Mr. King said he thought he ought to be entitled to something because he was personally guaranteeing the repayment of the $10 million to King Resources, which was an obligation that he didn't have at the present time. That is all the ODB, who was the IOS bank, had, was a non-recourse loan.

"So it was a right to take the stock that was existing which wasn't worth the value of the loans; and John said, 'Well, if I'm going to guarantee King Resources because ODB can't go against me in this situation, they don't have any rights

against me and I don't have any guarantees out with respect to these items, I ought to be entitled to something for that guarantee.'

"And that was part of the argument that was going on between Mr. Lowry and Mr. King, and that eventuated in *John's guaranteeing*, as I remember, *to repay the loan to King Resources in case the thing fell out of bed* and limiting any profit that could be made by the trust with the existence of the option agreement." (Tr. 51) (emphasis added)

 Whether the guarantee was ever executed or collected when the take-over "fell out of bed" is irrelevant in the context of the issue at hand. What is to be noted is that, in the earliest stages of the negotiations, John King's conflicts of interest were being discussed, not only by Mallin and King, but by KRC's general counsel, Tim Lowry. The take-over was not inevitable at this point, but was understood to depend upon ratification of the agreement by the Board of Directors of KRC and approval by the SEC. See Trustee's Ex. 1. A director may not participate in a vote in which he has a personal interest, and Mallin was entitled to believe, on the evening of April 25, 1970, that King would not so participate in the KRC decision of whether, and on what conditions, the amalgamation would occur. Mallin may have been alerted to the fact that conflicts were extant and that representing the interests of KRC in the take-over would require extraordinary diligence and attentiveness; but, he had no reason to question the fact of his retention as counsel. Consequently, I hold that even though John King had a conflict of interest with the corporation for whom he retained Mallin's services, he was not divested of his ability to employ the attorney. Once employed by a corporation, a lawyer owes his allegiance to the entity and not to the stockholder, director, officer, employee, representative or other person connected with the entity. *Allen v. District Court, 184 Colo. 202, 519 P.2d 351 (1974).* Whether Mallin acted in accordance with this allegiance in proceeding to satisfy the first condition of the IOS take-over is another matter and will be

addressed in the next section. Likewise, the fact that the initial letter agreement named John King and not KRC as the party in interest raises questions concerning for whom Mallin was working, not for whose interests he had been retained to represent.

Having determined King had the authority to retain, and did retain, Mallin as special counsel for KRC, it is unnecessary to address the question of whether the retention was ratified. This finding is consistent with the fact that one bill submitted by Mallin was paid by the company, and the rest disputed only in part. It is not the fact of employment, but the extent of employment which is at issue here.

## III. Conflicts of Interest

The record is full of evidence that Mallin and his firm had at one time or another, represented most if not all of the principal actors involved in the take-over attempt. Mallin had represented the executives of IOS in personal tax matters both before and after the attempted take-over, and IOS itself had paid the fees. (Fol. 97, 108) He had originally set up the King childrens' Bahamian Trusts and had served as its counsel in various matters up until the time of the take-over attempt. (Tr. 25) He had also done extensive personal tax work for John King and work for the Colorado Corporation. (Tr. 21) In addition, Delafield Capital was a client of Mallin's before, during and after the merger attempt (Fol. 369), as was Mercantile Trust, who served as trustee to the Bahamian Trusts and loaned a considerable amount of money to KRC during the take-over attempt. (Fol. 133, 370) In sum, Mallin had represented, or his firm was currently representing, all the key players.

 An attorney is not automatically precluded from representing a party merely because he has formerly represented others who are parties to the current transaction. However, an attorney owes a fiduciary duty to the client by whom he is retained to exercise his independent professional judgment on behalf of that client.

ABA Code of Professional Responsibility, Canon 5, EC 5–18. This includes the duty to disclose any conflicts of interest that may arise from his representation of other parties. Actually, the duty goes further than simple disclosure. Given that the duty is upon the attorney to "divulge conflicts, and not upon the client to ferret them out", the attorney should not only inform the parties of the former representations, but should evaluate for himself, as well as for his client, any potential for impropriety that might arise. *Pennwalt Corp. v. Plough, Inc. 85 F.R.D. 264 (D.C.Del.1980)*; ABA Code Prof.Resp. Canons 4, 5, 9. Only such reflection on the part of the attorney could lead to the "full and fair disclosure" required. Thus, the general rule that a lawyer may represent clients with potentially conflicting interests with the consent of the clients is qualified in that it must be "obvious" that he can adequately do so. ABA Code Prof.Resp. Canon 5, DR 5–105.

 Mallin claims that all parties were aware of his former and continuing representations. As far as his disclosure to KRC, Mallin testified, ". . . Mr. King was totally aware of the representation that I was doing for the IOS people and had been doing, as well as the representation I had done for him and the Colorado Corporation." (Tr. 38) At least insofar as the Bahamian Trust transaction, King was an interested party and the question arises whether knowledge on the part of John King constituted sufficient disclosure of Mallin's former representations and the conflicts that could arise. I hold that it did not. Information related to an interested party as a director is not imputed to the corporation. *J. J. McCaskill v. United States, 216 U.S. 504, 30 S.Ct. 386, 54 L.Ed. 590 (1910); Fidelity & Deposit Co. v. Courtney, 186 U.S. 342, 22 S.Ct. 833, 46 L.Ed. 1193 (1902); DeBaca v. Higgins, 58 Colo. 75, 143 P. 832 (1914).* Claimant states in his brief that Roth-Carlson was ethically bound to represent only one party in connection with the IOS take-over. (Claimant's Brief at 14, f.n. 8) KRC was a publicly held corporation and John King did not equal KRC. Mallin (and Roth-Carlson) had a duty to

confirm the understandings reached with King as to these former and continuing representations by speaking to some other officer or director of the company. There is no evidence that he did so. The ramifications of this failure will be discussed hereafter.

Mallin claims the interests of the parties involved in the take-over transaction were not "adverse" so as to create a problem of conflict disclosure. To understand the interest of each party it is necessary to elaborate on the details of the Bahamian Trust loan transaction.

The Bahamian Trust loans were paid off by a $10 million loan from Delafield Corporation to Mercantile Bank (Trustee). The loan was reflected by three promissory notes for $7,000,000; $2,000,000 and $1,000,-000 issued by Mercantile as Trustee to Delafield (Trustee's Ex. 16, 18, 19). The IOS shares held by the trust were pledged as collateral. Contemporaneously, Mr. King, by Mr. Lowry as attorney-in-fact, executed a loan agreement for $2,000,000 which was being loaned to King by Delafield, and was in turn used as collateral for the $10 million loan. (Trustee's Ex. 8) A pledge agreement involving the pledge of 286,000 unregistered common shares of KRC by Mr. King was also executed by Mr. Lowry, as King's attorney-in-fact. (Trustee's Ex. 13) The King children's *domestic* trusts, by Mr. Lowry, as Trustee, executed yet another pledge agreement, posting 2,750,000 common shares of the Colorado Corporation as additional collateral (Trustee's Ex. 22; "Put Agreement"). The Colorado Corporation, by Mr. Lowry as attorney-in-fact, entered into a contemporaneous Guaranty Agreement in which the Colorado Corporation "severally and unconditionally guarante[ed] to Delafield the performance by John M. King of his obligation under the Put Agreement." (Trustee's Ex. 11).

So, of the $10 million required for the King Trust loan, Mr. King ultimately provided $3,000,000 through loans from Mercantile and Delafield. Mr. Cowett was to provide $2,000,000, but he advanced only

$400,000, and the remaining $1,600,000 was ultimately funded by Delafield. The remainder of the $10 million was funded by a $5,000,000 transfer of funds from KRC. The notes were completed May 5, 1970 and were payable on demand after May 15, 1970. Thus the loans were to be for a ten day period only and were contemplated as interim financing while other, more long term, arrangements were made. The temporary nature of this loan, together with the fact that the entire take-over depended on SEC approval, are evidence that this was not only a complicated transaction, but a fragile one. To say that the interest of KRC, IOS, John King, the Bahamian Trusts, Mercantile Bank, Delafield Corporation, the Colorado Corporation and the domestic trusts were not "adverse" in this context, is absurd. Of course, the problem in this case, as in so many others, is that nobody anticipated that the deal would fall through. When it did fall through, the conflicts became more apparent. This is evidenced by Mallin's testimony that, after May 23, his time was spent "cleaning up" the loans that had been created during this period, and that Mallin was involved in, "trying to restrain Delafield from collecting" on some of the loans. (Tr. 154) His testimony continues that he felt at that time that Delafield was "being unduly harsh" in demanding repayment. (Tr. 155) What Delafield was doing was pursuing its own interests which, in fact, were contrary to the best interests of KRC. This is exactly the type of opposing interest Mallin should have been able to anticipate.

The problem in this case goes beyond one of disclosure and that issue cannot be properly disposed of without first addressing the following additional facts. Despite adamant professions that he was acting solely as retained counsel for KRC, actions of the claimant seem to belie his words. For instance, Edward Cowett counseled with Mallin about IOS seeking a possible merger with KRC before KRC was even approached on the subject. (Fol. 45) Mallin flew to Denver with Cowett and accompanied him to the first meeting with KRC officials before the subject of Mallin's employment by KRC was even brought up. (Fol. 45–50) Mallin had a general power-of-attorney for Cowett during this time period and signed a document relating to the transaction as attorney-in-fact for Cowett. (Fol. 54) All of the early transactions and documentation was done in the name of John King individually, rather than in the name of KRC. (Fol. 365) Even the time sheets submitted by Mallin are confusing, the matter being primarily billed to "John King", "King" and only occasionally to "King Resources." (Claimant's Ex. D)

Furthermore, the record indicates that Mallin's firm drafted several documents in connection with the merger to which KRC was not even a party. (Fol. 108) Other documents and legal work such as loans from Delafield or Mercantile to KRC were negotiated and executed without an attorney, apart from Mallin, present to represent the interest of the lendors. (Fol. 300)

It seems clear that John King did indeed plan to assign any interest he would acquire in IOS to KRC, but whether prior to such an assignment he felt it was "his" transaction or a company transaction, remains a mystery. Language in the letter agreement to the effect that King would transfer his interests in the take-over to KRC "at [his] cost basis" strongly suggests that the costs incurred would be considered personal prior to any such transfer of interests. (Trustee's Ex. 1) There are several other indications in the record that John King was proceeding as an individual. Although he no doubt had the ultimate benefit of KRC in mind, the merger was not pursued through normal company channels. No formal executive committee meeting was held and no immediate Board of Directors meeting called. Although the use of John King's name on the original loan documents can be explained by the concern for SEC approval, there is little explanation for why the letter agreement made no reference to the condition that KRC pay off the Bahamian Trust prior to proceeding with the provisions as set forth in that letter agreement. Likewise, although Mallin testified that it was represented to him by KRC's general

counsel, Tim Lowry, that the agreement had been ratified by KRC's executive committee, (Fol. 292) there is strong evidence that no such ratification took place, at least insofar as the trust loan condition was concerned. (See Claimant's Ex. M, KRC Board of Directors minutes for July 1, 1970 and July 16, 1970)

Much has been said in other cases arising out of this merger attempt of the ratification, or lack thereof, by KRC of the Bahamian Trust transaction. *See United States v. King Resources Company, 614 F.2d 703 (10th Cir.) cert. den. 449 U.S. 952, 101 S.Ct. 357, 66 L.Ed.2d 216 (1980).* The Tenth Circuit held, in the above cited case, that the transaction was ratified by KRC's Board of Directors in July, 1970. The court based that holding on the strong presumption of validity given any corporate directors minutes and the fact that the minutes do reflect a ratification by the board. Of course, that finding is not binding on the parties to this case; however, although I found the opposite in the trial of that case, I hesitate to make another finding, contrary thereto, and I limit my finding in the instant case to noting that prior to the July 1, 1970 meeting, there was no valid ratification of the Bahamian Trust portion of the take-over by the executive committee of KRC. This is supported by the addition to the July 1, 1970 corporate minutes by Mr. Boone, a necessary party to the executive committee, who stated that his understanding was that Mr. King was going to make a bid for IOS individually, but for KRC if it wanted it. He further stated that KRC would not be bound prior to approval by the Board of Directors. This is consistent with the decision mentioned above which found that the funds of KRC were advanced or committed by Mr. King without prior authorization of the corporation. *(614 F.2d at 705)* It is noteworthy that by the time the ratification occurred in July, several months had passed and KRC was irrevocably in debt, having invested some $15 million in the take-over.

The question here is not whether John King fraudulently advanced the funds of his company, or whether his actions in the IOS take-over attempt were ratified by the company, but the propriety of Mallin's actions, as attorney for KRC, in participating in the transaction without making inquiry as to the company's approval and knowledge of his own possible conflicting interests. When Mallin drafted or reviewed the loan documents concerning the Bahamian Trusts, was he working for KRC or for John King? Having been retained in the interest of the former, should he not have made specific efforts to assure himself of the knowledge and endorsement of the company as to the transaction in which he was engaged? Mallin repeatedly relies on the fact that Lowry, KRC's general counsel, was cognizant of the facts and represented to him that the transaction was known to and endorsed by the company. (Tr. 171, 172) However, Mallin had dealt with Lowry formerly as King's personal representative and knew Lowry represented King personally as attorney-in-fact in this transaction. He also knew Lowry represented the King domestic trusts and the Colorado Corporation. It is fair to say that Mallin had reason to doubt Lowry's absolute fidelity to KRC in the situation. Mallin also testified that, besides himself, the only people who understood the "so-called key figure" concept, the Bahamian Trust portion of the transaction, were John King, Cowett, Lowry, and possibly Harding Lawrence. (Tr. 141–144) Mr. Lawrence was to be appointed President of IOS after the take-over, and therefore apparently had his own reasons for seeing the deal succeed. (Trustee's Ex. 1) William Fishman, the KRC employee who was recruited to fly to New York to assist Mallin in drafting loan documents, testified that he was aware of the IOS take-over and the provisions of the letter agreement, but had no idea of the specifics of the trust transaction. (Tr. 191) It seems curious the condition would not have been mentioned since Fishman arrived in Mallin's offices May 5, the date the condition was satisfied. Finally, William Coffey, who transferred the funds from KRC for the take-over, testified that he did so relying on a specific representation by Mr. Lowry that the transfer had been approved by

KRC's executive Committee. He was not informed of the details of the trust loan transaction and became aware of the facts of that transaction only at the July 1, 1970 directors meeting. (Tr. 506–510)

I do not agree with the Special Master who reviewed these facts and found that the Trustee had raised "doubts and suspicions, but substantiate[d] no specific allegation or suggestion." There are certain factual situations where the conflicts of interests between parties are so critically adverse to one another so as not to permit the representation of multiple parties by an attorney, even with the consent of all parties made after full disclosure. *Jedwabny v. Philadelphia Transportation Co., 390 Pa. 231, 135 A.2d 252 (1957), cert. den. 355 U.S. 966, 78 S.Ct. 557, 2 L.Ed.2d 541 (1958); Kelly v. Greason, 23 N.Y.2d 368, 296 N.Y. S.2d 937, 244 N.E.2d 456, 462 (1968).* The facts of this case present just such a situation, both as to the questions raised regarding John King and the numerous other parties. Mallin owed his undivided loyalty to KRC. When an individual director or officer of a corporation seeks representation from an attorney hired by the corporation, the attorney may serve the individual only if the lawyer is convinced that differing interests are not present. ABA Code of Professional Responsibility Ethical Consideration 5–18. I have already held that John King's conflicts of interest with KRC required Mallin to make disclosure to and receive consent from someone other than King with regard to his former and continuing representation of other parties to the transaction. I now hold that Mallin had a similar duty to make independent inquiry into the endorsement of the take-over by the company prior to proceeding with the preparation of documents consummating that take-over. His failure to do so, in light of the conflicts which have been discussed herein, gives rise to grave concerns as to the propriety of his actions. This is in addition to the fact that he may have been representing others than KRC or King in the transaction. It is well settled that where an attorney is shown to represent more than one party with conflicting interests, a court may deny him all compensation under a retainer agreement. *Woods v. City Bank Co., 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1950); Silbiger v. Prudence Bonds Corp., 180 F.2d 917 (2nd Cir.), cert. den. 340 U.S. 831, 71 S.Ct. 37, 95 L.Ed. 610 (1950).* The attorney will not be heard to argue that the conflicting interests had no effect upon his conduct. *Id.* It is presumed that harm to the client has resulted. *Goldstein v. Lees, 46 Cal.App.3d 614, 120 Cal.Rptr. 253 (1975). See, also Frank v. Bloom, 634 F.2d 1245 (10th Cir. 1980).*

Viewing the record as a whole, I think that there has been a sufficient showing of conflict of interest without adequate disclosure to justify denial of attorneys fees to Mallin in this action. When one views the totality of the circumstances, it becomes apparent that at least an "appearance of impropriety" is present if not a bona fide multiple conflict of interest. It certainly *appears* that Mallin has violated ABA Disciplinary Rule 5–105, and such an appearance may, in and of itself, justify a court denying compensation. *Goldstein v. Lees, 46 Cal.App.3d 614, 120 Cal.Rept. 253, 256 (1975).* I recognize that Ethical Consideration 5–15 of the ABA Code allows an attorney in certain non-litigation matters, to represent multiple clients as long as their interests only differ slightly; however, the evidence in this record far surpasses what was contemplated by that exception.

Since the majority of the questions of conflict arise in connection with that portion of the transaction referred to as the Bahamian Trust transaction, and since there is evidence to suggest KRC was aware of the provisions of the take-over as set forth in the letter agreement, and endorsed the take-over on those grounds, I limit the denial of fees to that portion of time spent consummating and cleaning-up the trust loan condition, but, as to those parts of Mallin's claim, I disallow compensation.

## IV. Reasonableness of Fees

This is not a court award of attorney fees, but an action in contract, and the

numerous recent Tenth Circuit opinions on fee allowances by a court aren't directly involved. Therefore, although a court has inherent power to inquire into the fee arrangements to protect a client from excessive fees or to protect against conflicts of interest, it will be hesitant to alter the terms of the contract absent a showing that the arrangement is unreasonable or unfair. *See In Re Michaelson, 511 F.2d 882 (9th Cir.) cert. den. 421 U.S. 978, 95 S.Ct. 1979, 44 L.Ed.2d 469 (1975)*. The agreement of the parties, as brought out by the evidence, was that Mallin's firm was to be paid its normal hourly rate, plus a bonus if the venture was successful. (Fol. 51) The attorney's fees requested by Mallin were computed on the basis of hours appearing on time cards submitted by each individual attorney. (Claimant's Ex. 1) Mallin's, Gubar's and Linden's time were billed at their normal rate of $100 per hour, $70 per hour and $35 per hour respectively. (Fol. 69) Five additional Roth-Carlson attorneys spent a small amount of time on the IOS matter, and their time was also reflected in the second bill.

 Factors to be considered in determining if the fees charged were reasonable are: (1) length of time required to represent the client efficiently; (2) value of legal services to the client; (3) complexity of the case; (4) the attorney's expertise and skill; (5) the usage in the legal community for similar endeavors; and (6) the success of the venture. *See e.g., Opplander v. Standard Oil Co., 64 F.R.D. 597 (D.C.Colo. 1979); Hartman v. Freedman, 197 Colo. 275, 591 P.2d 1318 (1979); Bolles v. O'Brien, 59 Colo. 261, 151 P. 450 (1915).* Mallin was a sophisticated attorney with a great deal of expertise in the area of tax. (Tr. 14–17) He had participated in other mergers, principally focusing on the tax aspects of the transactions. *Id.* Although this type of work may not be considered "legal" in the strictest sense, there is no doubt that an attorney may charge for "business advice"

given in his professional capacity. *Bolles v. O'Brien, supra.* The reasonableness of rates charged are made in reference to those prevalent in the community in which the attorney offers his services, and there was evidence presented in this case that the hourly fees charged by Mallin were typical for a firm such as Roth-Carlson in New York, in 1970. *See, Enyart v. Orr, 78 Colo. 6, 238 P. 29 (1925)*; (Tr. 19–21) I see no reason to disturb the agreement of the parties as to these hourly rates.

 Of more concern are the number of hours charged in this case. The testimony was that this was an intensified effort and that all parties involved worked very hard. Mallin personally billed 367 hours in May, 1970 (Tr. 72), including one 24 hour day that was billed in its entirety. (Tr. 67) By my calculations, this amounts to 11.8 hours a day, every day, that Mallin worked. I'm not sure that such a schedule is humanly possible and the 24 hour day absolutely baffles the mind. Mallin's billing practices during this time period are reminiscent of a line of doggerel recently penned by a patron of the criminal side of this court, "Lawyers charge by the hour when figuring their pay; But what baffles science is their sixty-hour day." [1] Under cross-examination, Mallin himself admits the bill was "somewhat overstated." (Fol. 382) Consequently, for the time periods for which compensation is allowed, I have reduced the maximum hours compensable for any given day, to 10. Even this seems generous, because I doubt that any attorney could remain productive for 10 hours a day over a sustained period of time.

Mallin's testimony makes it clear that his time, and that of the firm, was spent on the Bahamian Trust transaction up to and including May 5, 1970. From that date until May 23, 1970, his time was spent on meeting the second condition—the $20 million loan. As of May 23, 1970, the venture was abandoned and time billed by Mallin after that date was for clean-up relating to the

1. Trenton H. Parker, *An Ode to My Son/An Attorney to Be*, (March, 1982) (Copyright 1982, he says).

original $10 million loan. (Tr. 154) Using these dates and the time and amounts reflected in the time sheets submitted by Mallin (reduced to reflect 10 hour days), I arrive at a figure of $28,100.50 as the amount owing Mallin under the contract.

As for disbursements, Claimant seeks $11,390.21. Of this amount, $9,797.70 is reflected on the books of KRC as owing. The remaining $1,592.51 reflects a later bill to KRC for "additional out of pocket disbursements." KRC apparently never disputed the $9,797.70 when tendered in the July 23, 1970 bill. For this reason, and this reason alone, I am going to allow most of the $9,797.70 amount. A request by KRC for a breakdown of the bill resulted in the following information: (1) Telephone—$1,427.52; (2) Taxi and Transportation—$847.27; (3) Meals—$451.68; (4) Postage—$14.60; (5) Advance for Client—$85.00; (6) Duplicating—$879.42; (7) Messenger and Delivery—$27.85; (8) Non-professional overtime—$472.26; (9) Travel—$2,348.50; (10) Air Conditioning—$3,243.60. (See Claimants Ex. F) Some of these "disbursements" are disturbing, particularly the charges for non-professional overtime and air conditioning. Had they not been approved by the company, there would seem to be grounds for rejecting these bills on the basis that they were excessive. These bills were approved and were admitted. However, I can't stomach the air conditioning claim even though admitted. This was for cooling the building during off hours, and I think it is beyond the most liberal interpretation of the contract. At least someone such as I who practiced before there was air conditioning can't go along with ordering a client to pay a lawyer to be comfortable rather than sweating. As to the later bill for "out of pocket expenses" of $1,592.51, there is no showing as to what the expenses were and it wasn't approved. I disallow it.

The total amount awarded claimant is $34,654.60. This is about one-third of his claim, but, with the conflicts of interest and patent bill padding taken into account, this is the most I can in good conscience allow.