**In re DAIG CORPORATION, Debtor.**

**Bankruptcy No. 4–81–1159.**

United States Bankruptcy Court,
D. Minnesota.

March 25, 1985.

See also, Bkrtcy., 17 B.R. 41.

David Bennett, and Phillip W. Bohl, of Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., for debtor.

Hart Kuller, of Winthrop, Weinstine & Sexton, St. Paul, Minn., and David Black, of Stacker & Ravich, Minneapolis, Minn., for Merrimac Associates, Inc.

James Rubenstein, Minneapolis, Minn., for Equity Sec. Holders' Committee.

Don Johnston, Minneapolis, Minn., for unsecured creditors' committee.

## ORDER LIMITING COMPENSATION

MARGARET A. MAHONEY, Bankruptcy Judge.

The above-entitled matter came on for hearing on November 6, 1984, before the Honorable Margaret A. Mahoney, Bankruptcy Judge. Continued hearings were held on December 17, 1984, and January 7, 1985. Daig Corporation (Daig), the debtor, has moved pursuant to 11 U.S.C. §§ 327, 328 and 330, and Bankruptcy Rules 2016, 9013 and 9014, for an Order Limiting Compensation to Merrimac Associates, Inc. (Merrimac), and avoiding a common stock purchase warrant granted by Daig to Merrimac. Specifically, Daig requested in its motion that compensation to Merrimac be limited to the total amount of $5,398.84— consisting of compensation totalling $4,680 and reimbursement of expenses totalling $718.84—and that Merrimac be required to refund to Daig all amounts actually paid by Daig to Merrimac that are in excess of the allowed amount.[1] Daig further requests that a September 23, 1981, attempt by Merrimac to exercise the common stock purchase warrant be avoided and determined to be of no force and effect. This Court has jurisdiction to hear and decide this matter pursuant to 28 U.S.C. §§ 1334 and 157, and Judge Lord's July 27, 1984, Order of Reference.

## FACTS

This is an unusual case in that it presents apparently novel questions of law within a relatively convoluted factual context. In its simplest form, the facts reveal a financially troubled corporate debtor, plunged into an involuntary chapter 7 proceeding, which hires a business consulting firm to rescue it from bankruptcy. In exchange for Merrimac's consulting services, Daig agreed to pay Merrimac $1,500 per week and also granted to Merrimac a 5-year option to purchase approximately 15 percent of Daig's outstanding common stock at a penny per share. Not long after hiring Merrimac, Daig apparently grew dissatisfied with Merrimac's involvement. It issued a notice of termination to Merrimac effective 30 days hence, and Merrimac left Daig after rendering only approximately two months of services. Merrimac, however, had already received the full amount of weekly compensation due pursuant to the parties' agreement, as well as additional compensation for accounts receivable collections services rendered. It later made an unsuccessful attempt to exercise the common stock purchase warrant granted to it by Daig. Both forms of compensation, while agreed to between the parties, have been neither authorized nor approved by the Court. To date, no fee application has been filed by Merrimac. However, it was both the Court's and parties' understanding that Daig's present motion would be treated as if it was a fee application filed by Merrimac.

### A. Daig Corporation—Pre-Bankruptcy

Daig, incorporated in October 1974, was founded by its president and chairman of the board, John Fleischhacker. A manufacturer of medical implant devices, such as pacing leads for heart pacemakers, Daig was apparently a financially sound and

---

**1.** At the hearing and in Daig's motion papers it was established that Daig is not contesting the amount of compensation paid to Merrimac for accounts receivable collecting services rendered by Merrimac employee Harry Kramer. Such compensation, totalling $1,680.00, is included in the amount requested by Daig to be allowed pursuant to 11 U.S.C. § 330(a), and has in fact already been paid by Daig to Merrimac. Compensation paid to Mr. Kramer, however, although uncontested, remains subject to Court review and approval.

profitable corporation throughout much of its pre-bankruptcy existence. It is primarily a manufacturer and supplier for other medical manufacturers, and its products are generally not available to the ordinary consumer. Moreover, it caters to a limited market which is shared only by approximately 25 other producers worldwide. The record indicates that throughout the 1970's, Daig enjoyed a comfortable relationship with its primary lender Northwestern Bank of Hopkins, its customers, and the investment community.

On July 17, 1980, Daig significantly expanded its operations through the acquisition of 77.3 percent of the outstanding stock of Medcor Corporation (Medcor) from International Nickel Company, Inc. (International Nickel). The Medcor acquisition, constituting Daig's initial foray into the pacemaker manufacturing market, cost a total of $3.7 million. Apparently prompting the acquisition was Daig's expectation that Medcor pacemaker technology could be profitably marketed. However, such did not prove to be the case.

While the record fails to indicate the status of Medcor prior to the acquisition, it appears that sometime shortly thereafter the worldwide market for Medcor products was somewhat dismal.[2] Daig's initial expectation was to market a new line of Medcor pacemakers by January, 1981. However, significant electronic malfunctions were encountered which apparently foreclosed further development of that Medcor product line. As a result of malfunctions in the first pacemaker line, FDA approval was withheld on a second Medcor line of pacemakers due to similarities in product design. Although not entirely clear, it appears that the development and marketing of new Medcor pacemakers was never successfully achieved by Daig.

Saddled with rising development costs and insufficient offsetting income, Medcor quickly became a substantial and continuing drain on Daig's finances. Moreover, the record indicates that Daig expended significant funds in effectuating a move of Medcor's employees, equipment, and assets from their original Florida location to Minnesota. By early Spring, 1981, Daig was forced to renegotiate the Medcor stock purchase with International Nickel. Ultimately, Daig signed a $3.3 million note payable to International Nickel. At about the same time, apparently, Daig guaranteed all of the obligations of Medcor, including the loan obligation to Pan American Bank, Medcor's primary lender. Daig's disintegrating financial condition was further evidenced by an unsuccessful public offering of Daig stock in early 1981.

Prior to the end of May 1981, the Pan American Bank telexed Daig's customers instructing them to send directly to the bank all monies owed to Daig. Upon learning of the Bank's actions, Daig then sent a telex to its customers instructing them to ignore the earlier Pan American telex. Subsequent to Daig's actions, the Pan American Bank abruptly called its Medcor loans. At this point, Daig was in serious financial condition. Its largest customer, Pacesetter, was significantly in arrears. Daig had little or no cash, and its primary lender, Northwestern Bank of Hopkins, refused any further extension on Daig's line of credit. Already, a portion of the Northwestern Bank loan to Daig had been personally guaranteed by Mr. Fleischhacker. Finally, by a letter dated May 28, 1981, the Northwestern Bank of Hopkins demanded immediate payment on all loans to Daig.

On May 29, 1981, Daig closed its doors. In the afternoon of May 29, an employee meeting was held during which the circumstances of the closure were disclosed and the employees were informed that future compensation for services could not be guaranteed. Daig officers in attendance at the meeting were Douglas Hoag, Peter Lilienthal, and Dick Swenson. John Fleischhacker, who was expected to attend the employee meeting, was not present. Instead, Mr. Fleischhacker had left town to offer testimony for a customer in an Indi-

---

**2.** William Hoag indicates in his deposition that by Spring of 1981, "there were less than 100 customers worldwide for Medcor products." Deposition at 8.

anapolis trade theft suit as well as to attend a Tennessee divorce hearing in which he was not a party. Mr. Fleischhacker contacted neither the Northwestern Bank of Hopkins nor any of Daig's suppliers prior to his departure to Indianapolis and Tennessee, and apparently made no attempt to contact either at least until he returned to the Twin Cities on approximately June 5, 1981. On June 10, 1981, an involuntary petition for relief under chapter 7 of the Bankruptcy Code was filed against Daig by International Nickel and two other creditors.

## B. *Merrimac Associates, Inc.*

Merrimac, a financial management and consulting company, was formed in 1970 by its president, Robert Stahl. Essentially, the services provided by Merrimac fall into three categories. First, the company performs project-by-project consulting. Second, it acts as a management firm and manages companies, some of which are partially or wholly owned by Merrimac or Mr. Stahl. Finally, Merrimac is involved in workout projects with troubled companies, some of which are either in or out of chapter 11. Merrimac's first experience with a company involved in bankruptcy occurred in 1975. It was not until 1978, however, that the corporation became more extensively involved in bankruptcy matters. From 1975 to the present, the corporation has been involved in more than 25 independent chapter 11 matters before the bankruptcy courts.

In all of its consulting arrangements, Merrimac seeks to be compensated in one of two ways. First, Merrimac offers a short-term activity fee arrangement whereby its client might be charged either a set hourly or set daily rate. Merrimac also offers a long-term activity fee arrangement in which the rates are slightly discounted from the short-term rates. In conjunction with the discounting of the long-term rates, Merrimac often seeks some form of bonus arrangement. The record indicates that one purpose behind the bonus arrangement is to compensate the corporation for the risks it assumes in taking on a long-term client. Due to an inability to extensively analyze prospective client companies prior to establishing the consulting relationship, Merrimac is often unfamiliar with the odds of success. Consequently, the corporation generally negotiates for, and sometimes receives, a bonus in the form of a stock purchase warrant as additional compensation.

As to Merrimac's short-term rates, in June of 1981, the corporation's rate schedule applicable at that time indicates both hourly and daily amounts as they relate to each of the corporation's associates. The short-term hourly rates during that period were as follows:

| | |
|---|---|
| Robert Stahl | $300.00 |
| David Heider | $100.00 |
| Bert Merrical | $75.00 |
| Harry Kramer | $60.00 |
| Marcia Rose | $30.00 |
| Patrick Stahl | $30.00 |
| Joann Tolisher | $30.00 |

In contrast, the short-term daily rates, during the same period, were discounted slightly from the respective hourly rates for a comparable amount of time. These daily rates were as follows:

| | |
|---|---|
| Robert Stahl | $2,200.00 |
| David Heider | $700.00 |
| Bert Merrical | $550.00 |
| Harry Kramer | $450.00 |
| Marcia Rose | $200.00 |
| Patrick Stahl | $200.00 |
| Joann Tolisher | $200.00 |

Long-term rates for associates of Merrimac during June of 1981 were even further discounted. The corporation's long-term hourly rates were as follows:

| | |
|---|---|
| Robert Stahl | $180.00 |
| David Heider | $60.00 |
| Bert Merrical | $45.00 |
| Harry Kramer | $36.00 |
| Marcia Rose | $18.00 |
| Patrick Stahl | $18.00 |
| Joann Tolisher | $18.00 |

A similar discount was built into the long-term daily rate schedule. Determined on the basis of an eight-hour day, the long-term daily rates were as follows:

| | |
|---|---|
| Robert Stahl | $1,500.00 |
| David Heider | $500.00 |
| Bert Merrical | $350.00 |

| | |
|---|---|
| Harry Kramer | $300.00 |
| Marcia Rose | $150.00 |
| Patrick Stahl | $150.00 |
| Joann Tolisher | $150.00 |

Merrimac's use of stock purchase warrants as bonus compensation dates as far back as 1971. The idea for including the warrant as part of a compensation package was not an idea original to Merrimac. In fact, Mr. Stahl testified that he had become familiar with the use of a stock purchase warrant in this manner by observing its application in other consulting arrangements with which Merrimac was not involved. In all, Merrimac has received a warrant in connection with its work on nine separate occasions. During the summer of 1981, Merrimac had a total of six outstanding warrants, including that received from Daig. In all cases, the warrants outstanding at that time were for five years. Moreover, depending upon the applicable company, the warrants granted Merrimac an option to purchase between 9 and 28 percent of the outstanding committed shares of the companies. With few exceptions, the warrants provided Merrimac with a cost per share of one cent to ten cents. Finally, depending upon the company, the warrants entitled Merrimac to a number of shares ranging in amount from 100 to 138,514.

Additional purposes behind the stock purchase warrant arrangement are essentially twofold. First, the warrant has a purpose of compensating Merrimac in circumstances in which its client may have little cash and is not anticipated to accumulate significant amounts of cash during the process of being restructured. The second purpose behind the warrant is that it is intended to provide a certain benefit to the financially troubled company. The warrant arrangement is intended to allow a company to retain some of its cash, and is intended to further allow for compensation to Merrimac in a manner which affects all stock holders of the company in proportion to their respective shares.

In all cases, Merrimac sought stock purchase warrants only in conjunction with long-term engagements. In the context of a chapter 11, Merrimac anticipated that a long-term engagement would last for five to eight months.

C. *Daig's Consulting Arrangement with Merrimac Associates, Inc.*

For some time prior to closing its doors on May 29, 1981, Daig was apparently aware of its financial difficulties. The record further indicates that on several occasions John Fleischhacker met with bankruptcy attorney Howard Patrick to discuss the corporation's financial situation as well as the alternate bankruptcy procedures that were available. Mr. Patrick, however, was apparently never retained by Daig, and the record contains no further indication of any action taken by Mr. Fleischhacker on behalf of Daig concerning the possibility of bankruptcy.

Although Robert Stahl of Merrimac did not actually meet with Mr. Fleischhacker until June 6, 1981, which was approximately one week after Daig's doors were closed and shortly after Mr. Fleischhacker's return to town, Mr. Stahl was contacted on three or four occasions during the preceding month of May by Mac Hoy, a concerned lessor of Daig. Apparently subsequent to these conversations with Mr. Hoy, Mr. Stahl met with Peter Lillianthal, an officer of Daig, and Bill Wydell, a loan officer with the Pan American Bank in Florida, to further discuss Daig's situation. Despite these early attempts to involve Merrimac in Daig's debilitating circumstances, to the extent that Merrimac might have been able to stem or restrict the saprogenic effect of Daig's May 29 closure, it lacked and was unable to acquire the appropriate authorization from Daig and the Court.

On June 6, 1981, Mr. Stahl finally met with Mr. Fleischhacker to discuss Daig's present situation and the possibility of hiring Merrimac to help Daig resolve its problems. While no agreement was reached at that time, at least a portion of that June 6 meeting was devoted to discussing the alternative methods in which Merrimac would be compensated upon employment. The discussion of terms included reference

to Merrimac's short-term and long-term rates.

The record indicates that between June 6 and June 11, 1981, Mr. Fleischhacker communicated on occasion with both Mr. Stahl and David Heider of Merrimac concerning Merrimac's prospective employment. By June 11, 1981, the parties had reached an agreement whereby Merrimac would provide consulting services to Daig in exchange for weekly compensation in the amount of $1,500 per week. The parties' management consulting agreement further provided that Merrimac would render consulting services and advice concerning the affairs of Daig, including:

> Financial planning, planning and executing corporate goals, public relations, relations with customers, suppliers, bankers and other members of the financial community and such other areas as the Company shall request and which are reasonably related to the type of advice and assistance rendered by a management consultant.

The agreement additionally incorporated a cancellation provision whereby either party could cancel the agreement upon 30 days' written notice.

The parties also entered into a common stock purchase warrant whereby Merrimac retained a five year option to purchase 138,514 shares of Daig's common stock at one cent per share. The record indicated that the purchase warrant entitled Merrimac to approximately 15% ownership of Daig. Moreover, the warrant included certain antidilution provisions such that the percentage ownership of Daig to which Merrimac was entitled pursuant to the agreement remained constant. While Mr. Fleischhacker had the opportunity to consult with counsel during the negotiations between Daig and Merrimac, apparently no effort was made to do so.

As authorized pursuant to a resolution of Daig's board of directors on June 11, 1981, Mr. Fleischhacker executed both the consulting agreement and stock purchase warrant on that same day. Retaining his position as chairman of Daig's board of directors, Mr. Fleischhacker relinquished his positions as president and chief executive officer of the corporation to Mr. Heider of Merrimac.

On June 16, 1981, John Fleischhacker filed an application on behalf of Daig requesting leave to retain Merrimac. Such application referred to and included both the consulting agreement and the stock purchase warrant, and it specifically requested authorization to retain Merrimac upon the terms and conditions agreed to between the parties. On June 17, a hearing was held on the issue of retention of Merrimac. The next day, on June 18, Daig was authorized by Court Order to employ Merrimac. However, such Order explicitly reserved all questions of "terms of retention, compensation, and other related matters" to further hearing and further order.

### D. *The Consulting Relationship*

Pursuant to the parties' agreement, a substantial amount of the consulting services rendered by Merrimac were so rendered through its associate, David Heider, who served as president and chief executive officer of Daig. The record indicates that in the performance of his duties, Mr. Heider relied on the expertise and contributions of other employees of Merrimac, including its president, Mr. Stahl.

Initial efforts on behalf of Merrimac were directed toward reopening the doors of Daig, and bringing that corporation out of involuntary chapter 7. Specifically, Mr. Heider worked with Daig personnel, as well as with Mr. Stahl, to prepare the necessary financial data, including financial projections and cash flow analyses, to present to the Northwestern Bank of Hopkins in conjunction with their negotiations to effectuate a cash collateral agreement. This financial data gathering process was seriously aggravated by the fact that Daig's accounting records were in disarray. Moreover, the seizure of Daig's computer and computer records contributed to the problem. Concurrent with negotiations concerning the cash collateral stipulation, Mr. Heider was also involved in negotiations with various utilities, including the

phone and gas companies. To reopen for business and reinstate the services of certain utilities, it was necessary for Daig to place certain deposits with the utilities, or to negotiate with them concerning such deposits.

On June 16, 1981, apparently in conjunction with legal counsel and Merrimac, Daig had prepared and filed the necessary petition and supporting documents converting Daig's involuntary chapter 7 to a voluntary chapter 11. On June 17, Merrimac submitted to the Court for approval a cash collateral stipulation between Daig and the Northwestern Bank of Hopkins. At that same time, Merrimac also sought and received Court approval to pay the pre-petition claims of Geneva Laboratories, which did sterility testing for Daig. Geneva Laboratories, which provided testing services crucial to Daig, had threatened to terminate services entirely absent such payment. Approximately 10 days after Merrimac's initial employment, Daig had received the necessary financing and court authorizations to move forward and conduct business as a chapter 11 debtor-in-possession.

Following court approval of the cash collateral stipulation, Daig began the process of recalling many of its employees. Mr. Heider was involved in this process in the form of discussions with top Daig personnel as to basic questions concerning the products which needed to be manufactured, the personnel necessary to meet such needs, and Daig's financial ability to meet the various salaries. Mr. Heider did not participate in the determinations of specifically which personnel were to be rehired. Such questions were left to other officers of Daig. By the end of June, 1981, Daig was back in operation. As operations continued into July, additional employees were rehired and the operations were expanded.

In either later June or early July, Mr. Heider began directing some of his concerns toward Medcor, which was significantly responsible for Daig's current financial condition. Attempts were made to negotiate with the Pan American Bank, Medcor's primary lender, with apparently little progress. In addition, Mr. Heider and other Daig officers continued to evaluate Medcor in terms of how to best proceed in manufacturing and marketing Medcor's technology. During this period, upon a determination made by Daig officers and legal counsel, including Mr. Heider and John Fleischhacker, Medcor was placed in a voluntary chapter 11. The timing of such voluntary filing was determined on the basis that Medcor might be able to avoid certain preferential transfers to the Pan American Bank. Specifically, the avoidable preference concerned a security interest granted to the Pan American Bank upon loans which were guaranteed by Daig.

Apparently throughout the first month of Merrimac's employment, Merrimac worked with Daig personnel and legal counsel to assemble the necessary financial data and other information for inclusion in Daig's bankruptcy schedules and statement of affairs. Ultimately, such documentation was filed with the court on approximately July 9, 1981. Furthermore, the record indicates that Mr. Heider attended a number of bankruptcy court hearings, including the June 17 hearings concerning its retention by Daig and the cash collateral stipulation between Daig and Northwestern Bank of Hopkins.

On July 9, 1981, John Fleischhacker sent a letter to Merrimac Associates informing Merrimac that Daig was cancelling their consulting arrangement. The letter specified that services would continue for a period of 30 days, pursuant to the consulting agreement. Furthermore, Mr. Fleischhacker indicated therein that it was his understanding that termination of the consulting agreement also constituted a termination of the stock purchase warrant. On August 5, 1981, Robert Stahl formally replied by way of letter to Mr. Fleischhacker's July 9 letter. In the August 5 letter, Mr. Stahl indicated that Merrimac would terminate all services on August 8, 1981. In addition to listing certain duties to be accomplished by the August cut-off date, including payment in full on the Merrimac account, Mr. Stahl informed Mr. Fleischhacker that his

cancellation of the consulting agreement did not serve to effectuate any cancellation of the stock purchase warrant.

Both prior to and after Mr. Fleischhacker's cancellation notice on July 9, Mr. Heider had installed and continued to utilize certain cash management and expense accounting procedures. These procedures included an expense control approach whereby Mr. Heider approved all checks and purchase orders prior to their issuance for the purpose of determining and assuring that the requisite funds were available. A weekly cash management reporting system was also established such that all necessary financial data was properly supplied to the United States Trustee's office. Finally, Mr. Heider established an internal cash flow reporting system, separate from the previously referred to reporting system, for the purpose of making corporate decisions. Although some attempts were made during this period by Daig personnel to close the corporation's books for past months, such was viewed as a low priority concern and, at best, the books were closed for only approximately two or three months.

During the period of Merrimac's employment, Mr. Heider was also involved in negotiations with Daig's landlord and with all of the leasing companies which were leasing production equipment to Daig. As an apparent result of these negotiations, no attempts were made by the equipment lessors to repossess their leased equipment. Moreover, Daig was never threatened by the landlord at this time concerning possible eviction.

Mr. Heider's time log for the period roughly corresponding to Merrimac's employment by Daig indicates that he contributed approximately 45 hours per week of his time to Daig and Daig-related matters for a total of 364.2 hours. Only 304.4 hours, however, were contributed during the period commencing from Merrimac's

June 18 court authorization to its August 8 termination, amounting to an average weekly contribution of approximately 43 hours. In addition to Daig, Mr. Heider was at that time working on three other chapter 11 cases for Merrimac. Furthermore, Mr. Heider's time sheets include both time spent on Daig and Medcor matters, and do not provide a breakdown of the time attributable to each. While the testimony indicated that the $1,500 weekly compensation provided for under the consulting agreement between the parties was based upon the understanding that services would be provided to Daig for three days each week, the parties further understood that not all Daig-related work would be performed on Daig's premises. In fact, of the services provided to Daig by Mr. Heider, many of such services were provided off of Daig's premises.

While the majority of consulting services rendered directly to Daig were so rendered by Mr. Heider, Robert Stahl contributed a sizeable number of hours in both a consulting and supervisory capacity. In addition, both Harry Kramer and Marcia Rose, associates of Merrimac, contributed services to the consulting relationship. The total number of hours contributed by Merrimac employees to the consulting arrangement with Daig were as follows: [3]

| | |
|---|---|
| Robert Stahl | 158.0 hours |
| David A. Heider | 364.2 hours |
| Harry Kramer | 78.0 hours |
| Marcia Rose | 3.5 hours |
| TOTAL | 603.7 hours |

Assuming the reasonableness and necessity of the time contributed by each of the respective Merrimac employees as above stated, and based upon the short-term and long-term hourly rates ordinarily charged by Merrimac during that time period, the value of Merrimac's services would be as follows:

---

**3.** Despite some evidence in the record indicating a total contribution by Marcia Rose of 5.5 hours, such is not borne out by the time logs submitted on her behalf. Consequently, I am adopting the figure of 3.5 hours as such is more fully supported by the record.

| Name | Short-term Value | Long-term Value |
|------|------------------|-----------------|
| Robert Stahl | $47,400 | $28,440 |
| David Heider | $36,420 | $21,852 |
| Harry Kramer | $ 4,680 | $ 2,808 |
| Marcia Rose | $ 105 | $ 63 |
| TOTAL | $88,605 | $53,163 |

Based upon the parties' actual agreement that Merrimac should receive weekly compensation in the amount of $1,500 per week, which agreement was premised upon the understanding that Mr. Heider would contribute the equivalent of approximately three days of services per week, Merrimac did receive, subject to court approval, $10,-500. Merrimac also received, subject to court approval, $1,680 as compensation for accounts receivable collections services rendered to Daig, and $718.84 as reimbursement of expenses.

### E. Post-termination Activities

On August 1, 1981, one week prior to the formal termination of Merrimac Associates as consultant to Daig, John Fleischhacker hired James Keller as vice president of finance. In that capacity, Mr. Keller proceeded to complete the closing of the books and records of Daig, a process which had previously been begun by other Daig personnel under Mr. Heider's authority. Mr. Keller also sought to reconcile various discrepancies in Daig's accounts receivable, as well as to implement cash flow forecasting separate from that which already existed. Mr. Keller also contributed time and effort to negotiate a reduction in the utility deposit with the telephone company, as well as the reestablishment of open accounts with Daig's suppliers. The record further indicates that he was involved in continuing negotiations with Daig's landlord and equipment lessors. Mr. Keller, who was compensated by Daig in the salary amount of $40,000 per year, left the corporation in October, 1983, as a result of its improved financial condition.

At all times subsequent to this Court's approval on June 18, 1981, of Merrimac's employment by Daig, Robert Stahl, as president and sole shareholder of Merrimac, believed that Merrimac possessed a valid, approved, and exercisable stock purchase warrant for approximately 15 percent of the shares of Daig. This was so despite the unequivocal language in this Court's June 18 Order explicitly reserving consideration of such matters to further hearing and order. At no time during the term of Merrimac's employment did Merrimac file with the Court an application for approval of compensation. In fact, subsequent to Daig's termination of Merrimac's employment, Merrimac attempted to exercise the stock purchase warrant outside of the purview of the Court on September 23, 1981. After discussions between the parties' respective counsel, apparently on matters unrelated to any necessity for prior Court approval, Merrimac withdrew its attempt to exercise the warrant at that time. Moreover, the record indicates that on September 24, 1982, Robert Stahl received a letter from Mr. Keller, on behalf of Daig, specifically questioning the enforceability of Merrimac's warrant in light of this Court's June 18, 1981, Order. While Mr. Stahl apparently conferred with counsel concerning this letter, no application for approval of compensation has ever been filed.

On October 3, 1984, Daig brought its present motion to limit compensation and avoid Merrimac's stock purchase warrant. Prior to any hearing on this matter, the parties submitted to the Court on a brief written stipulation of facts the issue of whether Merrimac was a disinterested person pursuant to 11 U.S.C. § 101(13). That issue was resolved in my December 12, 1984, Order in which I held that "absent any further showing, Merrimac is a disinterested person as provided for in § 328(c) and as defined in § 101(13)."

### DISCUSSION

Daig's motion in this matter was brought pursuant to 11 U.S.C. §§ 327, 328, and 330, and requests the following relief: (a) avoidance of the stock purchase warrant and disallowance of all fees and expenses in excess of $5,398.84 as unreasonable compensation; (b) avoidance of the stock purchase warrant as improvident in light of developments unanticipatable at the time it

was entered into; and (c) avoidance of the stock purchase warrant and denial of all compensation and reimbursement of expenses as a result of Merrimac's failure to satisfy the "disinterested person" requirements of 11 U.S.C. § 101(13). On a preliminary stipulation of facts the parties earlier submitted for consideration to this Court the question whether Merrimac was a disinterested person pursuant to sections 101(13) and 328(c). While my decision on that issue was in the affirmative, it did not preclude an evaluation of the same issue on the more fully developed factual record arising out of the actual hearing.[4] Consequently, the effect of section 328(c), as applied to the present facts, must once again be addressed.

### A. Merrimac's "Disinterested Person" Status

In light of the potential severity of sanctions available under section 328(c) of the Bankruptcy Code it is necessary to first consider Daig's claim that Merrimac was not a "disinterested person" as that phrase is defined in 11 U.S.C. § 101(13). Despite the clear permissive wording of section 328(c),[5] it is in fact the rare case in which any compensation is allowed a professional person who does not meet the statutory "disinterested person" criteria. *See In re Watson Seafood & Poultry Co., Inc.*, 40 B.R. 436 (Bktcy.E.D.N.C.1984) (compensation reduced); *In re Philadelphia Athletic Club, Inc.*, 38 B.R. 882 (Bktcy.E.D.Pa.1984) (expenses only allowed). In fact, while many courts recognize the discretionary nature of the section 328(c) sanction, the majority have denied all compensation to fee applicants where conflicts of interest, no matter how remote, were found to exist. *See, e.g., In re Georgetown of Kettering, Ltd.*, 750 F.2d 536, 11 C.B.C.2d 1097 (6th Cir.1984); *In re Norman*, 41 B.R. 8 (Bktcy.

M.D.Ala.1984); *In re B.E.T. Genetics, Inc.*, 35 B.R. 269 (Bktcy.E.D.Cal.1983); *In re Chou-Chen Chemicals, Inc.*, 31 B.R. 842 (Bktcy.W.D.Ken.1983); *In re Sambo's Restaurants*, 20 B.R. 295 (Bktcy.C.D.Cal.1982); *In re 765 Associates*, 14 B.R. 449 (Bktcy.D. Hawaii 1981).

■ By my previous Order on this matter, it was determined that possession of an unapproved stock purchase warrant as compensation for services rendered to a debtor-in-possession was insufficient, in and of itself, to disturb the otherwise disinterested status of a professional person employed pursuant to section 327(a). Daig, however, argues that, based upon the facts arising out of the hearing, the evidence now reveals adequate grounds upon which to compel a determination that Merrimac was not a disinterested person. Specifically, Daig argues that despite the fact that Merrimac lacked a court-approved stock purchase warrant, Merrimac believed further Court approval to be unnecessary and, therefore, acted as consultant to Daig with the belief that it possessed a valid, approved, and fully exercisable warrant.

The applicable statutory basis upon which Daig roots its argument arises out of 11 U.S.C. §§ 101(13) and (15). Section 101(13) defines the phrase "disinterested person" in relevant part as follows:

> "disinterested person" means person that—
>
> (A) is not a creditor, an equity security holder, or an insider;
>
> . . . .
>
> (E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connec-

---

**4.** For a full discussion of my decision at that time, see my Order dated December 12, 1984.

**5.** Section 328(c) provides in full:

Except as provided in section 327(c), 327(e), or 1107(b) of this title, the court *may* deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of

this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

11 U.S.C. § 328(c) (1982) (emphasis added).

tion with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason;

11 U.S.C. § 101(13)(A) and (E) (1982). As to the phrase "equity security," the following statutory definition is further enlightening:

"equity security" means—

. . . .

(C) warrant or right, other than a right to convert, to purchase, sell, or subscribe to a share, security or interest of a kind specified in subparagraph (A) or (B) of this paragraph;

11 U.S.C. § 101(15)(C) (1982). Moreover, it is clear that the type of equity security contemplated by section 101(13) is an equity security of the debtor. 11 U.S.C. § 101(16) (1982).

By the clear statutory language, and in light of the decision in my prior Order, there can be no doubt that, based upon the complete factual record, Merrimac did not and does not yet possess an equity security as that phrase is defined in section 101(15)(C). According to this Court's June 18, 1981, Order retaining Merrimac, the status of Merrimac's stock purchase warrant was and remains subject to Court review and approval. Until approved, it constitutes no more than a prospective warrant which is insufficient to satisfy the definitional requirements for an "equity security". Consequently, it is clear that Merrimac has met the standards set out in section 101(13)(A) concerning its status as a disinterested person.

Daig persuasively argues, though, that Robert Stahl, as president and sole shareholder of Merrimac, believed Merrimac held a valid and binding warrant for 15 percent of Daig's stock both during and after Merrimac's employment by Daig. Accordingly, it is asserted that in light of Mr. Stahl's belief, Merrimac was in a position identical to that of an actual equity security holder and, therefore, pursuant to section 101(13)(E), should be found not to be a disinterested person. In essence, Daig's contention is that by virtue of Merrimac's *incorrect belief* that it was an equity security holder, Merrimac had an interest materially adverse to the interest of Daig's bankruptcy estate, any class of creditors, or any class of equity security holders.

■ At the outset of my analysis herein, it should be noted that section 101(13) sets forth a broad definitional category for the phrase "disinterested person" which excludes persons with even the slightest interest or relationship that would color the independent and impartial attitude required by the Code. *In re Philadelphia Athletic Club, Inc.*, 20 B.R. 328, 338 (E.D.Pa.1982); *Matter of Cropper Co., Inc.*, 35 B.R. 625, 629 (Bktcy.M.D.Ga.1983). 2 Collier on Bankruptcy ¶ 327.03[3][f] (1984) (see cases cited and discussed therein).[6] Illustrative of this broad category, Congress has also provided a series of specific examples of circumstances in which a conflict of interest clearly arises. *Matter of Cropper Co., Inc.*, 35 B.R. at 629 (statutory listing contained in section 101(13) viewed as purely illustrative).[7] For example, the section

6. As indicated in my prior Order, it remains axiomatic that the mere fact that Merrimac is a creditor of Daig as a result of professional services rendered during the course of the bankruptcy does not in and of itself indicate the requisite adverse interest. There clearly exists a point at which other provisions of the Bankruptcy Code are designed to best monitor compensation awards under such circumstances. *See, e.g.,* 11 U.S.C. §§ 328(a), 329(b), 330 (amended 1984).

7. While it is possible to view the various subsections of section 101(13) as separate and wholly independent tests for conflicts of interest, such

an interpretation is not totally consonant with the existing legislative history and caselaw on the subject. Section 101(13), though expanded and modified, was adopted from Chapter X, Section 158 of the Bankruptcy Act. H.R. No. 95–595, 95th Cong., 1st Sess. 310–311 (1977); S.R. 95–989, 95th Cong., 2d Sess. 23–24 (1978), U.S.Code Cong. & Admin.News, 1978, p. 5787. Section 158(4), the counterpart section to section 101(13)(E) of the Code, has been described as the "catch-all clause". *See* 6 Collier on Bankruptcy ¶ 7.08[5] (14th ed. 1978). That description has appropriately survived to the present. *See In re Philadelphia Athletic Club, Inc.*, 20 B.R.

101(13)(A) reference to "equity security holder[s]" carries with it a presumption that an equity security holder of the debtor will not be capable of acting with that degree of impartiality and disinterested judgment which is expected of professional persons employed pursuant to section 327(a). *Cf. In re Realty Associates Securities Corp.*, 56 F.Supp. 1007 (E.D.N.Y. 1944) (construing reference to "stockholder" in section 158 of the Bankruptcy Act). *See* 2 Collier on Bankruptcy ¶ 327.03[3][b] (1985).[8]

Clearly, a professional person who incorrectly believes he or she is an equity security holder could maintain the same degree of partiality and interest in the context of basic decision-making as any actual equity security holder similarly employed. In both cases there exists the same risk that the professional person will act in a manner calculated to maximize the value of his or her equity interest, real or imagined, at the expense of the interests of the bankruptcy estate or of any class of creditors or equity security holders. The fact that a professional person might be mistaken as to his or her status as an equity security holder is immaterial in this regard.

■ In the present case, Merrimac's belief, as projected through its president and sole shareholder, Mr. Stahl, that it possessed a valid, approved, and exercisable warrant created the risk that it would render consulting services in a manner calculated to increase the value of the warrant at the expense of all other interests. As recognized in my prior Order, where Court approval of this form of compensation remains a condition precedent to the actual award, any potential self interest in effectuating a rehabilitation is sufficiently diminished such that section 328(c) should not be invoked to deny the compensation. In light of Merrimac's belief that Court approval was unnecessary, however, there was no diminution of its inherent interest to act to benefit itself alone.[9]

Merrimac does not appear to contest Daig's characterization of the facts, which is clearly supported by record, to the effect that Mr. Stahl did not consider further Court review and approval necessary. Instead, Merrimac states that it now concedes that its entire compensation package is subject to this Court's approval. Such an argument misses the point. Merrimac's current legal posture is irrelevant to the firm's clear position during the period of its employment by Daig. The fact that it might now constitute a "disinterested person" in no way alters its previous status.

Merrimac also contends that by virtue of my prior order Daig must demonstrate actual bias in order to succeed on this issue. Not only is this assertion in contravention with the plain wording of my December 12,

---

328, 333–34 (E.D.Penn.1982); *Matter of Codesco, Inc.*, 18 B.R. 997, 999 (Bktcy.D.N.M.1982).

**8.** The Securities and Exchange Commission Report on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees (SEC Report) provides:

> A trustee who is a stockholder or a creditor ... can hardly be expected to take action which may result in invalidating or impairing the worth of his own stock in the debtor or of his own claim against it, regardless of the advantage of such action to the estate as a whole.

SEC Report, Part VIII, 110 (1940). It has been stated that "[t]his reasoning is equally applicable to the employment of professional persons by the trustee." 2 Collier on Bankruptcy ¶ 327.-03[3][b], p. 327–15 n. 23 (1985).

**9.** It may be argued that the proper remedy still remains in the form of Court review pursuant to section 330 of the Code. This approach is incorrect for two reasons. First, it fails to impose any sanction whatsoever upon Merrimac for not maintaining a disinterested posture throughout its involvement in the case. Such does not effectively discourage similar future conduct. Second, the record carries every indication that, absent Daig's present motion, Court review would never have occurred. Merrimac already has attempted to exercise the warrant on one occasion without first involving the Court. In addition, the record contains an indication that in a separate bankruptcy case, Merrimac successfully exercised a stock purchase warrant apparently without ever receiving Court approval.

1984, Order,[10] it appears to lack any significant case law support.[11] The existing authorities on this subject are replete with references to the effect that the purpose behind the "disinterested person" requirement is to prevent even the emergence of a conflict irrespective of the integrity of the person under consideration. *See, e.g., Meredith v. Thralls,* 144 F.2d 473, 475 (2d Cir.), *cert. denied,* 323 U.S. 758, 65 S.Ct. 92, 89 L.Ed. 607 (1944); *In re Philadelphia Athletic Club, Inc.,* 20 B.R. at 335; *In re Norman,* 41 B.R. at 13; *Matter of Cropper Co., Inc.,* 35 B.R. at 630–31; *In re Cou-Chen Chemicals, Inc.,* 31 B.R. at 850; *Matter of Codesco, Inc.,* 18 B.R. 997, 999 (Bktcy.S.D.N.Y.1982); *Matter of Perry, Adams & Lewis Securities, Inc.,* 5 B.R. 63, 64 (Bktcy.W.D.Mo.1980); 2 Collier on Bankruptcy ¶ 327.03[3][f] (1985). While a showing of actual bias might bolster Daig's argument, the merits of this matter are not wholly dependent thereon.

### B. Sanctions for Conflict of Interest

As previously indicated, the majority of decisions concerning conflicts of interest have denied all compensation where a conflict of interest was found. Many of those courts which have so held have placed substantial reliance on *Woods v. City National Bank & Trust Co. of Chicago,* 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820 (1941). In *Woods* the Supreme Court broadly pronounced that "[w]here a claimant ... was serving more than one master or was subject to conflicting interests, he should be denied compensation." *Id.* at 268, 61 S.Ct. at 497. In explanation of its ruling the Court further provided:

The principle enunciated by Chief Justice Taft in a case involving a contract to split fees in violation of the bankruptcy rules, is apposite here: "What is struck at in the refusal to enforce contracts of

this kind is not only actual evil results but their tendency to evil in other cases." Furthermore, the incidence of a particular conflict of interest can seldom be measured with any degree of certainty. The bankruptcy court need not speculate as to whether the result of the conflict was to delay action where speed was essential, to close the record of past transactions where publicity and investigation were needed, to compromise claims by inattention where vigilant assertions was necessary, or otherwise to dilute the undivided loyalty owed to those whom the claim purported to represent. Where an actual conflict of interest exists, no more need be shown in this type of case to support a denial of compensation.

*Id.* (citations omitted). Broadly interpreted, the *Woods* opinion mandates a denial of compensation regardless of the circumstances of the case. *See In re Chou-Chen Chemicals, Inc.,* 31 B.R. at 849–853 (holding that an award of any fee at all would require a finding that no conflict of interest existed) (citing and discussing *Woods* ).

Several courts, however, have openly recognized the permissive wording of section 328(c). *See In re Watson Seafood & Poultry Co., Inc.,* 40 B.R. 436, 440 (Bktcy.E.D. N.C.1984); *In re Attorneys Office Management, Inc.,* 40 B.R. 127, 130 (Bktcy.C.D. Cal.1984); *In re General Coffee Corp.,* 39 B.R. 7, 8 (Bktcy.S.D.Fla.1984); *In re Philadelphia Athletic Club, Inc.,* 38 B.R. 882, 883 (Bktcy.E.D.Pa.1984); *See also Matter of King Resources Co.,* 20 B.R. 191, 204 (Bktcy.D.Colo.1982). While the general rule may be to deny compensation when a conflict arises, these decisions highlight the discretionary role of the courts to balance the equities of the case. *See generally In*

---

10. My prior Order contains no reference whatsoever as to the need for a showing of actual bias. In fact, I specifically held that the mere possession of an unapproved and unauthorized stock purchase warrant was insufficient to constitute the requisite adverse interest absent *any* further showing. *See* Order at 9.

11. There is some indication of case law support for Merrimac's position. *See* 2 Collier on Bankruptcy ¶ 328.04[2] (1985) (in absence of actual injury or prejudice to estate, section 328(c) sanction should not be rigidly applied) (see cases cited therein). I am not persuaded, however, that the mere appearance of impropriety should be insufficient to warrant some sanction.

*re Watson Seafood & Poultry Co., Inc.,* *supra.*[12]

In the present case, I am satisfied that the equities do not warrant a denial of all compensation. Merrimac rendered substantial services to Daig during the course of its two month employment. It assumed control of a tabescent corporation which had closed its doors and dismissed its employees, had been temporarily forsaken by its president and chairman of the board, and had been plunged into an involuntary chapter 7. Within approximately one month, as a direct result of contributions by Merrimac personnel, Daig was back in operation, manufacturing product as a Chapter 11 debtor-in-possession. There is neither any evidence of nor representation concerning actual bias on behalf of Merrimac. At best, Daig now questions the adviseability of the timing of Medcor's Chapter 11 filing. Whether or not this has any bearing on the issue of actual bias, I am not now prepared to evaluate with the benefit of hindsight legal judgments on this matter previously reached without such benefit. Finally, I am satisfied that Merrimac's involvement occurred at a sufficiently preliminary stage of this bankruptcy case such that the risk of harm to the interests of the estate or any class of creditors or equity security holders was significantly minimized.

Based upon the equities of the case, I find that the appropriate sanctions for Merrimac's lack of disinterestedness is avoidance of the stock purchase warrant in its entirety. While it is true that this does no more than eliminate the source of Merrimac's adverse interest, it should serve as a sufficient deterrent from similar future failures to avoid the appearance of impropriety. A more severe disciplinary measure herein is unwarranted.

## C. *Reasonableness of Compensation*

As a result of my decision to avoid Merrimac's stock purchase warrant, the only remaining issue before me is the reasonableness of the compensation and expenses previously paid by Daig to Merrimac. Throughout the consulting relationship, Merrimac received weekly compensation in the amount of $1,500.00 pursuant to the parties' consulting agreement. This weekly compensation totalled $10,500. Merrimac also received $1,680.00 in compensation for collections services rendered to Daig by Merrimac associate Harry Kramer. Finally, Merrimac incurred expenses in the amount of $718.84. Beyond the warrant, Merrimac is seeking compensation and expenses totalling $12,818.84.

Section 330 of the Bankruptcy Code allows reasonable compensation for actual, necessary services rendered by professional persons employed by the debtor.[13]

---

**12.** Harmonizing the *Woods* decision with the discretionary role adopted by some courts in reorganization cases, *see, e.g., Silbiger v. Prudence Bonds Corporation,* 180 F.2d 917 (2d Cir.), *cert. denied,* 340 U.S. 813, 71 S.Ct. 40, 95 L.Ed. 597 (1950), the Second Circuit Court of Appeals has stated that "Woods' recognition of the general rule ... does not strike us as a mandatory requirement that reorganization courts woodenly must deny compensation in every case of conflict of interest, regardless of facts." *New York, N.H. & H.R. Co. v. Iannotti,* 567 F.2d 166, 175 (2d Cir.), *cert. denied,* 434 U.S. 833, 98 S.Ct. 120, 54 L.Ed.2d 94 (1977). *See also In re Eastern Sugar Antitrust Litigation,* 697 F.2d 524, 533 (3d Cir.1982) (fees in class action settlement allowed to the extent they relate to ethical conduct alone).

**13.** Section 330 provides in relevant part:
   After notice to any parties in interest and to the United States trustee and a hearing, and

subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—
   (1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any para-professional persons employed by such trustee, professional person, or attorney, as the case may be, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title; and
   (2) reimbursement for actual, necessary expenses.
11 U.S.C. § 330(a) (amended 1984). It is undisputed that Merrimac was a professional person within the meaning of section 330(a). *See In re Carolina Sales Corp.,* 45 B.R. 750, 752–53 (Bktcy. E.D.N.C.1985).

Courts interpreting this section have generally applied a set of established criteria in determining the reasonableness of compensation. These criteria include:

(1) The time and labor required;

(2) The novelty and difficulty of the questions presented;

(3) The skill required to perform the service properly;

(4) The preclusion of other employment by the professional person due to acceptance of the case;

(5) The customary fee for similar work;

(6) Whether the fee is fixed or contingent;

(7) Time pressures imposed by the client or the circumstances;

(8) The amount involved and the results obtained as a result of the services rendered;

(9) The experience, reputation, and ability of the professional person;

(10) The "undesirability" of the case;

(11) The nature and length of the professional relationship with the client;

(12) Awards in similar cases.

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974); *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir.1977). While the above factors were primarily established in connection with attorney fee applications, they are equally applicable to fee applications of other professional persons as well.[14]

While, due to the unusual nature of Daig's motion, a fully detailed, formal fee application is unnecessary,[15] Daig directs the Court's attention to significant irregularities in the documentation submitted by Merrimac. As to the time log submitted by Robert Stahl, the record reflects that the numerical entries represent time approximations which were recorded only for the purpose of keeping track of who he talked to. Additionally, Mr. Stahl testified that his time was spent both in supervisory and consulting capacities. The time log, however, fails to provide a breakdown of either the actual time devoted to Daig matters or the amount of time directly attributable to nonsupervisory tasks. Mr. Stahl's testimony was not sufficiently illuminating on this issue as well.

▄▄▄ Merrimac should not be entitled to compensation for time devoted to other than Daig matters. Moreover, it would be inappropriate to compensate Merrimac for time expended by Mr. Stahl for supervisory tasks of no direct benefit to the bankruptcy estate, and for which compensation was never authorized. Where a fee application includes both allowable and nonallowable services with no reasonable means of differentiating between the two groups of services, all compensation for such services should be disallowed. *In re Watson Seafood & Poultry Co., Inc.*, 40 B.R. 436, 443 (Bktcy.E.D.N.C.1984). As the record on

---

**14.** Merrimac directs the Court's attention to the "lodestar" approach adopted by some courts in determining the reasonableness of compensation. The approach essentially calls for a determination of a lodestar amount by multiplying the number of hours reasonably expended by a reasonable hourly rate. *Copeland v. Marshall*, 641 F.2d 880 (D.C.Cir.1980); *In re Sapolin Paints Inc.*, 38 B.R. 807 (Bktcy.E.D.N.Y.1984). The lodestar is then further adjusted based on a number of factors basically enumerated in the *First Colonial* criteria. As I am deciding that the remaining fees and expenses are reasonable under either approach, it is unnecessary at this time to express any opinion as to which approach is more appropriate.

**15.** It should be noted that Bankruptcy Rule 2016 generally requires that an application for compensation set forth a detailed statement of (1)

the services rendered, time expended and expense incurred, and (2) the amounts requested. Although the parties have agreed to treat Daig's motion as a fee application on behalf of Merrimac, it is clear that, by virtue of the procedural posture of this matter, a requirement of strict conformity with Rule 2016 would be inappropriate. That is not to say, however, that the burden of proof on reasonableness of fees has in any way shifted from Merrimac to Daig. *See, e.g., Matter of U.S. Golf Corp.*, 639 F.2d 1197, 1207 (5th Cir.1981); *In re Coastal Equities, Inc.*, 39 B.R. 304, 310 (Bktcy.S.D.Cal.1984); *In re Werth*, 32 B.R. 442, 444 (Bktcy.D.Colo.1983); *Matter of Liberal Market, Inc.*, 24 B.R. 653, 657 (Bktcy.S.D.Ohio 1982); *Matter of Olen*, 15 B.R. 750, 752–53 (Bktcy.E.D.Mich.1981); *In re Underground Utilities Construction Co.*, 13 B.R. 735, 737 (Bktcy.S.D.Fla.1981).

the whole does not provide a reasonable basis upon which to determine allowable compensation attributable to Mr. Stahl, I am compelled to hold that Merrimac is entitled to no compensation whatsoever for his services.

■ In addition, the record indicates that, of the time recorded by David Heider, 59.8 hours were contributed either prior to Court authorization or subsequent to Merrimac's termination. Three hours listed on Marcia Rose's time log were similarly contributed subsequent to the termination of the consulting relationship. Where time is expended prior to court authorized employment, it is generally not compensable pursuant to section 330. *See In re Fiberglass Specialty Co., Inc.*, 12 B.R. 119 (Bktcy.D.Minn.1981); *see also Matter of Futuronics Corp.*, 655 F.2d 463 (2d Cir.1981), *cert. denied*, 455 U.S. 941, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); *In re Sapolin Paints Inc.*, 38 B.R. 807 (Bktcy.E.D.N.Y.1984); *In re Morton Shoe Companies, Inc.*, 22 B.R. 449 (Bktcy.D.Mass.1982). This is equally true as to services rendered subsequent to a professional person's termination by the debtor. Consequently, Mr. Heider's compensable time must be reduced by 59.8 hours to a total of 304.4 hours, and Ms. Rose's compensable time must be reduced to a total of only ½ hour.[16]

Daig additionally argues that Mr. Heider's time log impermissibly includes time attributable to both Daig and Medcor matters. While the record indicates that Mr. Heider was unable to determine how much time was spent on each matter, I am not convinced that such is necessarily fatal to Merrimac's present claim for compensation. Daig's deteriorating financial condition was largely due to the Medcor acquisition in which it became a 77.3 percent stockholder of Medcor. Merrimac's consulting role, therefore, necessitated an evaluation of Medcor in terms of its effect on Daig.

Based upon the above determinations, it is clear that Merrimac's entitlement to compensation must be evaluated solely in the context of the following hours contributed by Merrimac employees:

| | |
|---|---|
| David Heider | 304.4 hours |
| Harry Kramer | 78.0 hours |
| Marcia Rose | .5 hours |

Had these hours been billed to Daig at either Merrimac's short-term or long-term hourly rates, these services would be valued as follows:

| Name | Short-term Value | Long-term Value |
|---|---|---|
| David Heider | $30,440 | $18,264 |
| Harry Kramer | $ 4,680 | $ 2,808 |
| Marcia Rose | $ 15 | $ 9 |
| TOTAL | $35,135 | $21,081 |

Applying the *First Colonial* factors to this case, I find that, excluding the stock purchase warrant, the compensation and expense reimbursement previously paid to Merrimac is reasonable. Merrimac, as experienced bankruptcy consultants, undisputably contributed substantial time and labor under circumstances that necessitated prompt action. While Daig seeks to compare the services of Merrimac with those rendered by James Keller, Daig's vice president of finance from August 1981 to October 1983, such a comparison is unpersuasive. Both the services rendered and the circumstances were different. Moreover, I am not convinced that Mr. Keller's annual salary, as an employee of Daig, is a proper basis upon which to value the services of an outside consulting firm. Although Merrimac's employment by Daig was brief, sufficiently significant results were achieved which warranted compensation totaling $12,180.00, as well as reimbursement of expenses in the amount of $718.84.

IT IS THEREFORE HEREBY ORDERED that:

1. Merrimac's stock purchase warrant is avoided in its entirety.

2. Merrimac's attempt on September 23, 1981, to exercise the stock purchase warrant is avoided and of no force and effect.

---

**16.** Robert Stahl's time log included 73 hours as time expended either prior to Court authorization or subsequent to Merrimac's termination. As to such 73 hours, these facts provide an additional basis for disallowance of compensation attributable to Mr. Stahl.

138

3. Merrimac is allowed reasonable compensation in the amount of $12,180.00 and reasonable expense reimbursement in the amount of $718.84.